PEOPLE v COOPER

Docket No. 206970. Submitted January 12, 1999, at Detroit. Decided
     August 3, 1999, at 9:05 A.M. Leave to appeal sought.

  Lannel Cooper was convicted by a jury in the Recorder's Court of
    Detroit, Karen Fort Hood, J., of assault with intent to murder and
    possession of a firearm during the commission of a felony. The
    defendant was sentenced to a prison term of ten to twenty years
    for the assault conviction and the mandatory two-year sentence for
    the felony-firearm conviction. The defendant appealed.

    The Court of Appeals *held*:

    1. The defendant's contention that the trial court committed
  error requiring reversal by failing in its instructions to the jury con-
  cerning the element of intent to relate sua sponte the abstract
  notions of the intent instruction to the facts of the case is without
  merit. Not only did the defendant fail to preserve the question with
  an objection at trial, but also there is no duty on the part of a trial
  court to comment to the jury regarding the evidence or to point out
  the weak points in the prosecution's case insofar as they involve
  questions of fact rather than questions of law. Having given proper
  instructions with respect to the intent necessary to convict the
  defendant of the charged and included offense, the court did not
  err in failing to instruct the jury concerning how those instructions
  should be applied to the facts of this case.

    2. Because none of the defendant's allegations of prosecutorial
  misconduct were preserved by an objection at trial, appellate relief
  is precluded with respect to those allegations unless any prejudicial
  effect could not have been cured by a cautionary instruction or the
  failure to consider the issue would result in a miscarriage of
  justice.

    3. Although the prosecution's characterization in its closing argu-
  ment of the situation in this case as "another senseless shooting in
  the City of Detroit and almost another dead young black man" was
  improper because it injected into the case both the broader social
  issue of gun-related violence and the issue of race, the impropriety
  in question does not require reversal of the convictions because
  any undue prejudice could have been cured by a cautionary

instruction and the impropriety did not result in a miscarriage of justice.

4. The prosecution's suggestion that the jurors place themselves in the place of the victim for the purpose of understanding the anger that the victim displayed on the stand while being cross-examined by defense counsel was not an improper appeal to the jurors' alleged self-interest but was rather a proper argument that the victim's outbursts were understandable under the circumstances and should not reflect adversely on his credibility. In any event, any prejudice could have been cured with a cautionary instruction, and no miscarriage resulted from the prosecution's use of that argument.

5. The record does not support the defendant's assertions that the prosecution improperly disparaged defense counsel or that it improperly vouched for the victim's credibility during its closing argument.

6. No miscarriage of justice resulted from the prosecution's failure to produce the custodian of the victim's medical records. Under the circumstances, defense counsel's failure to object to the prosecution's failure to produce that witness may have been a matter of trial strategy.

7. The trial court did not err in instructing the jury regarding reasonable doubt or in failing to give sua sponte a cautionary instruction regarding eyewitness identification testimony. The instruction regarding reasonable doubt was drawn from CJI2d 3.2, which has been held to be adequate. A trial court is not required to give any special instruction regarding the manner in which a jury should treat eyewitness identification testimony.

8. The record does not support the claim that the defendant's trial counsel failed to provide the defendant adequate assistance of counsel.

9. The failure of the trial court to inform the defendant of his constitutional right to confront witnesses with respect to the witnesses that the prosecution did not call to testify did not result in error requiring reversal.

10. The defendant has not shown that reversal of his conviction is warranted on the basis of the cumulative effect of the alleged errors raised on appeal.

11. Const 1963, art 4, § 45, which provides that the Legislature may provide for indeterminate sentences, does not bar the Legislature from providing for determinate sentences. The purpose of Const 1963, art 4, § 45 was to expand the power of the Legislature, not to limit it. Accordingly, the determinate sentence provided for

in the felony-firearm statute, MCL 750.227b; MSA 28.242(2), is not constitutionally infirm.

.    Affirmed.

HOLBROOK, JR., J., concurred in the result only.

1. CRIMINAL LAW — JURY INSTRUCTIONS — INTENT.

A trial court need not instruct a jury sua sponte concerning how the jury should relate the abstract notions of an instruction relating to criminal intent to the particular facts of the case.

2. CRIMINAL LAW — JURY INSTRUCTIONS — REASONABLE DOUBT — CRIMINAL JURY INSTRUCTIONS.

The instruction regarding reasonable doubt found in the Criminal Jury Instructions is adequate (CJI2d 3.2).

3. CRIMINAL LAW — CONSTITUTIONAL LAW — RIGHT OF CONFRONTATION — UNCALLED WITNESSES.

A trial court need not inform a criminal defendant of the constitutional right to confront witnesses with respect to witnesses that the prosecution does not call to testify.

4. CONSTITUTIONAL LAW — INDETERMINATE SENTENCES — DETERMINATE SENTENCES — FELONY-FIREARM.

The provision in the Michigan Constitution authorizing the Legislature to provide for indeterminate sentences does not bar the Legislature from providing for determinate sentences; accordingly, the determinate sentence found in the statutory provision concerning possession of a firearm during the commission of a felony is not constitutionally infirm (Const 1963, art 4, § 45; MCL 750.227b; MSA 28.424[2]).

*Jennifer M. Granholm,* Attorney General, *Thomas L. Casey,* Solicitor General, *John D. O'Hair,* Prosecuting Attorney, *Timothy A. Baughman,* Chief of Research, Training, and Appeals, and *Valerie M. Steer,* Assistant Prosecuting Attorney, for the people.

*Ashford & Associates, P.C.* (by *Linda D. Ashford*), for the defendant.

Before: CAVANAGH, P.J., and HOLBROOK, JR., and WHITBECK, JJ.

Whitbeck, J. A jury convicted defendant of assault with intent to murder, MCL 750.83; MSA 28.278, and possession of a firearm during the commission of a felony, MCL 750.227b; MSA 28.424(2). The trial court sentenced defendant to ten to twenty years' imprisonment for assault with intent to murder, to be preceded by the mandatory two-year sentence for felony-firearm. Defendant appeals as of right. We affirm.

### I. BASIC FACTS

This case arises from the May 19, 1994, shooting of Mark McGinnis in Detroit. McGinnis testified that he and two friends were riding around a club where "everybody" would ride around "flirting with the girls and stuff like that." McGinnis was driving the car. Eventually, McGinnis stopped the car and talked with some females. At some point, according to McGinnis, he and his friends had contact with three other males who were in another car. McGinnis testified that these three males were drunk and had "angry faces" and further described their appearance as "eyes was red and they was looking—they was looking at our car, you know, they was up to—they was wanting to get their fight on, wanted to start some trouble."

McGinnis indicated that he drove a short distance away from the site of this initial encounter and that the other three males again rode up alongside the car that McGinnis was driving. McGinnis described a verbal exchange between the occupants of his car and the other car:

> Yeah, I asked them again, I was like what's the problem? And they was like you know what, b[——]. I'm, you know, like what the problem? Ain't nobody—we ain't looking at

y'all. And they was mumbling and saying something in their car and steady looking at me and I was like, man, they ain't no ho's over here is what I said.

McGinnis testified that defendant was an occupant of the other car, located in its front passenger seat, and explained that, while it was nighttime, the area was "lit up" by a "[m]illion lights" from cars backed up bumper to bumper along the street. McGinnis described a hostile exchange of words between defendant and himself:

[Defendant] was the one that was doing all the talking, like what you looking at, b[——]? And I was like, man, nobody for that—excuse my language—nobody for that dumb b[——], no ho's around here.

McGinnis testified that he eventually drove to a side street and that the other car again pulled up by them. According to McGinnis, the driver of the other car partially left that car. McGinnis got out of his car because he was "kind of nervous" and was worried that the individuals in the other car were going to shoot up the car that he had been driving. McGinnis indicated that he raised his hands as if to gesture that he did not want trouble. McGinnis said that one of his friends eventually left their car, that this friend was six feet, eight inches tall and that he thought this "spooked them because he was real tall."

McGinnis testified that defendant then leaned out of the window of the other car and shot McGinnis six times. McGinnis elaborated:

In my stomach, I got shot in my stomach and here in my groin, in my arm, in my leg, fractured my femur, one, two, three, four, five, and I think I got shot again in my stomach

because one came out my back. It was ricocheting all around.

Nearby police officers heard the shooting. McGinnis was transported to a hospital, where he was a patient for about four to five weeks after the shooting.

McGinnis testified that, following his release from the hospital, he saw defendant in the Northland Mall, apparently in Southfield, on Sunday, June 26, 1994.[1] McGinnis said he was "absolutely positively sure" that defendant was the person who shot him on May 19, 1994.

Detroit police detective Dennis Myers testified that he conducted a live line-up related to this case in June 1994 and that McGinnis identified defendant as the shooter at that line-up.

Detroit police officer Dwight Anding, the only witness called by the defense, indicated that he stopped and arrested three black males, a group that did not include defendant, at about 7:30 A.M. on May 19, 1994, in connection with investigating this shooting. While not expressly stated in the trial testimony, we presume that these three males were eventually released by the police and have not been charged with any crime in connection with this case.

## II. JURY INSTRUCTIONS WITH RESPECT TO ASSAULT WITH INTENT TO MURDER

Defendant argues that while the trial court set forth in abstract terms the intent element of assault with

---

[1] McGinnis' sighting of defendant at the Northland Mall led to defendant's arrest. Because the details of the arrest are not important to the issues raised on appeal, we do not recount testimony concerning that matter.

intent to murder and of the lesser offense of assault
with intent to do great bodily harm, the trial court
committed error requiring reversal because it "did not
[sua sponte] relate these abstract notions to any con-
crete facts in the case." Defendant claims that this
allowed the jury to speculate and conjecture in deter-
mining defendant's intent. While we reject defendant's
position as a matter of law, we note that this issue
was not preserved below. Thus, appellate relief is pre-
cluded absent manifest injustice. *People v Green*, 196
Mich App 593, 596; 493 NW2d 478 (1992).

Defendant does not contest the propriety of the
trial court's instructions concerning the elements of
assault with intent to murder or of assault with intent
to do great bodily harm. Neither does defendant
argue that the evidence was insufficient to submit the
charge of assault with intent to murder to the jury.
Rather, defendant contends that the trial court erred
in failing to give further instructions regarding *how*
the jury should have decided the *factual question*
whether defendant had an intent to murder (if the
jury concluded, as it obviously did, that defendant
was the shooter). We agree with the prosecution that
the trial court had no such obligation:

> It was not necessary for the trial judge . . . to review the
> testimony in detail in his charge to the jury. *The defense is
> not entitled of right to have the judge comment upon the
> evidence or point out the weak points in the State's case so
> far as they involve questions of fact* and not of law. [*People
> v Longaria*, 333 Mich 696, 699; 53 NW2d 685 (1952)
> (emphasis supplied).]

Indeed, it is inherent in our system of criminal juris-
prudence that a jury is presumed to have the capacity
to determine properly the facts from the evidence

presented. Thus, the trial court, after instructing the jury with regard to the elements of the charged crime of assault with intent to murder and the lesser offense of assault with intent to do great bodily harm, did not err in failing to instruct sua sponte the jury with regard to how to determine whether the shooting was actually done, as a matter of fact, with an intent to murder.[2]

### III. ALLEGED PROSECUTORIAL MISCONDUCT

Defendant alleges several instances of prosecutorial misconduct. Because none of these allegations were preserved by objection below, appellate relief is precluded unless any prejudicial effect could not be cured by a cautionary instruction or failure to consider the issue would result in a miscarriage of justice. *People v Warren (After Remand)*, 200 Mich App 586, 589; 504 NW2d 907 (1993).

### A. INJECTION OF ISSUES BROADER THAN GUILT OR INNOCENCE

We address first what we consider to be the most serious of these claims of prosecutorial misconduct. Defendant argues that the prosecutor improperly injected issues broader than defendant's guilt or innocence by referring to this case as "another senseless

---

[2] Moreover, if a trial court's remarks in jury instructions related the intent element of a charged crime reference too strongly to the facts of the case before it, this would pose the risk of implicitly instructing the jury that the intent element had been established as a matter of law, which would constitute error requiring reversal if the jury convicted the defendant of the pertinent crime. See *People v Edwards*, 206 Mich App 694, 696-697; 522 NW2d 727 (1994)  (reversing a conviction of second-degree child abuse based on an injury suffered by a child from leaving a bucket of hot water on the floor where the trial court used that very act as an example of the type of conduct constituting the crime).

shooting in the City of Detroit and almost another dead young black man, but it didn't happen that way." This remark was made near the beginning of the prosecutor's closing argument.

We conclude that this statement by the prosecutor was improper. Prosecutors "should not resort to civic duty arguments that appeal to the fears and prejudices of jury members." *People v Bahoda*, 448 Mich 261, 282; 531 NW2d 659 (1995); see also *People v Leverette*, 112 Mich App 142, 151; 315 NW2d 876 (1982) (improper prosecutorial argument "injected into the case the broader issue of crime"). While this may not have been the prosecutor's intent, the statement at issue may have suggested to the jury that sending a message of disapproval of gun-related violence in Detroit was a factor favoring conviction. This was particularly inappropriate given that the jury presumably consisted entirely of Detroit residents, because the trial occurred in the former Recorder's Court. The prosecutor's reference to the race of the victim was also improper because that is hardly a proper consideration in the determination of a defendant's guilt. We note the following commentary by the Michigan Supreme Court:

> As with all forms of prosecutorial misconduct, this Court abhors the injection of racial or ethnic remarks into any trial because it may arouse the prejudice of jurors against a defendant and, hence, lead to a decision based on prejudice rather than on the guilt or innocence of the accused. [*Bahoda, supra* at 266.]

In sum, the prosecutor's reference to the broader social issue of gun-related violence against young African-American men in Detroit was improper.

However, the remark was brief and added little to the obvious conclusion that the shooting at issue was a horrible incident. With regard to the racial element of the remark, both the victim McGinnis and defendant are African-American, which substantially reduces the likelihood of unfair prejudice to defendant. There is simply no reasonable basis to view this case as racially charged. We conclude that the impropriety in question does not require reversal, because any undue prejudice could have been cured by a cautionary instruction and the impropriety did not result in a miscarriage of justice. *Warren, supra.*

B. ALLEGEDLY ASKING JURORS TO PLACE THEMSELVES IN THE VICTIM'S POSITION

During closing argument, the prosecutor stated:

But I submit to you, ladies and gentlemen, that Mr. Mark McGinnis—and he was angry on that stand and shouldn't he be? This man almost lost his life. Can't we understand that? Would you be angry, someone shoots you six times? Yes. And you see them, you looking at them in court, he's so many feet away from you, wouldn't you be angry? I submit you would be.

Later, during rebuttal argument, the prosecutor said:

Would you have been mad, would you have been angry if you were sitting on that witness stand and one day you almost died because some individual that you identified as a person in the courtroom shot you and then someone's implying, well, you don't really know what you saw, do you? Would you be mad? You would be mad. Because Mr. McGinnis tells you I know what I saw, I know who shot me and it was this man, [defendant]. There's no doubt in my mind, I am positive that is the person.

Defendant argues that the prosecutor improperly asked the jurors to place themselves in the victim's position. Defendant refers to *Leverette, supra* at 150-152, in which this Court found prosecutorial argument to be improper in part because the prosecutor "argued from a hypothetical case putting the jurors in the position of the victim." *Id.* at 151. However, we can distinguish this case from *Leverette.* In *Leverette, supra* at 150-151, the comparison was made by the prosecutor in the context of arguing that the jury should not decline to convict because there was only one witness, the victim. The prosecutor essentially asked each juror to consider whether this argument would preclude a conviction if the juror was the victim of a crime with no other witness. The argument in *Leverette* presented the concern of making a juror more likely to convict out of concerns for suppressing crime despite not being convinced by the evidence of the defendant's guilt beyond a reasonable doubt. In contrast, the argument here did not appeal to the jurors' alleged self-interest. Rather, at their core, the prosecutor's remarks presented a rational argument from the evidence that displays of anger by McGinnis during his testimony did not reflect that he was incredible, but rather were consistent with McGinnis having been shot by defendant. See *People v Howard,* 226 Mich App 528, 548; 575 NW2d 16 (1997) (prosecutor may argue from the evidence that a witness is credible). While it may have been preferable if the prosecutor had not used terminology regarding what a juror would have done in McGinnis' place, we conclude that because the crux of the prosecutorial argument was proper, any arguable impropriety in these remarks could have been cured

by a cautionary instruction and did not result in a miscarriage of justice. *Warren, supra.*

### C. ALLEGED DISPARAGING OF DEFENSE COUNSEL

Defendant argues that the prosecutor improperly disparaged defendant's trial counsel. As set forth in the preceding subsection, the prosecutor in a portion of his rebuttal argument regarding McGinnis' credibility referred to McGinnis as being angry at times but as being provoked by defense counsel's questioning. However, the argument did not involve a "personal attack" on defense counsel or a statement that defense counsel had done anything inappropriate. Contrary to defendant's position, a reasonable person simply would not consider the remarks at issue as a suggestion that defense counsel was trying to present fabricated evidence. Rather, the prosecutor was permissibly arguing that McGinnis' anger at times during his testimony was consistent with his credibility in light of the shooting that he suffered. *Howard, supra.*

### D. ALLEGED IMPROPER BOLSTERING OF MCGINNIS' TESTIMONY

Defendant argues that the prosecutor improperly vouched for McGinnis' credibility during the following remarks in rebuttal argument:

> Well, defense counsel says, well, you can't listen to him, he was argumentative and he was evasive. Was he, was he? Did he answer all of his questions? I submit to you he did. He might not have answered the questions in the way that defense [sic] wanted, he might not have said what the defense wanted him to say, but he answered those questions. He answered each and every one of those questions.

This argument did not improperly vouch for McGinnis' credibility, but rather permissibly advanced rational argument in support of his credibility on the ground that he had answered defense counsel's questions. *Howard, supra.*

### E. ALLEGED FAILURE TO PRODUCE A WITNESS

Defendant argues that the prosecution improperly failed to produce the custodian of McGinnis' medical records as a witness at trial. However, because defendant did not move for a new trial or otherwise seek relief based on this issue below, we decline to review this issue. *People v Dixon,* 217 Mich App 400, 409; 552 NW2d 663 (1996); *People v Lawton,* 196 Mich App 341, 356; 492 NW2d 810 (1992); *People v Jackson,* 178 Mich App 62, 66; 443 NW2d 423 (1989).

Further, defendant has not shown that a miscarriage of justice would result from a failure to grant relief based on this unpreserved issue. *Warren, supra.* In this regard, we note that, after an extended discussion between counsel and the court near the close of the first day of defendant's trial regarding the production of witnesses, including the medical records custodian, trial defense counsel made no objection to the prosecution's failure to produce that witness before the prosecution formally rested its case on the second day of trial. In these circumstances, trial counsel's failure to object may have been an exercise of trial strategy based on a determination that the records custodian would have been unlikely to have provided favorable testimony.

IV. JURY INSTRUCTIONS REGARDING REASONABLE DOUBT AND
EYEWITNESS IDENTIFICATION

Defendant argues that the trial court's jury instruction regarding reasonable doubt, drawn from CJI2d 3.2, fails to present the concept of reasonable doubt adequately and that the trial court erred in failing to give a cautionary instruction sua sponte regarding eyewitness identification pursuant to *People v Anderson*, 389 Mich 155; 205 NW2d 461 (1973). Because defendant failed to preserve these matters by objection below, we may grant relief only to prevent manifest injustice. *Green, supra*. In any event, defendant has not established any error regarding this issue. Contrary to defendant's position, this Court has already determined that CJI2d 3.2 presents an adequate instruction regarding the concept of reasonable doubt. *People v Hubbard (After Remand)*, 217 Mich App 459, 487; 552 NW2d 493 (1996). *Anderson, supra*, involved constitutional requirements for evidence based on pretrial identification procedures to be admissible at trial. Contrary to the implication of defendant's argument, *Anderson* does not require any special jury instruction regarding the manner in which a jury should treat eyewitness identification testimony.

V. ALLEGED INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant raises claims of ineffective assistance of counsel. Reversal of a conviction on the basis of ineffective assistance of counsel requires a defendant to show, at minimum, (1) deficient performance by trial counsel and (2) a reasonable probability that but for the unprofessional conduct the result of the proceed-

ing would have been different. *People v Pickens*, 446 Mich 298, 312; 521 NW2d 797 (1994). We conclude that defendant has not shown that he received ineffective assistance of counsel.

First, defendant argues that trial counsel provided ineffective assistance by failing after eliciting testimony from the complainant that he saw the shooter sitting in the courtroom before the preliminary examination and asking if he was aware that defendant was in police custody at the time to introduce evidence of defendant being in police custody at the time. During cross-examination by trial counsel, McGinnis testified that defendant was in the audience of the courtroom at or near the time of the preliminary examination. The following exchange occurred:

> *Q.* So it would surprise you that—correct me if I'm wrong but it would surprise you that [defendant has] been in jail this whole time since he was arrested at Northland and never was allowed to be in any audience anywhere?
> *A.* He was out on bond, he came to preliminary exam.
> *The Court:* Excuse me, wait, wait, *I don't think so.* Move on. You're quiet. Ask another question please.

Trial counsel did not thereafter introduce evidence that defendant was in government custody at the time of the preliminary examination and, accordingly, that he could not have been in the audience. While we believe that it would have been better practice for trial counsel to have done so, the trial court by its remark, "I don't think so," indicated that defendant was not on bond, but rather in government custody, at the time of the preliminary examination. Further, the prosecution never attempted to contradict defense counsel's implication that McGinnis mistakenly indicated that defendant was in the audience of

the courtroom during the preliminary examination at a time when this would not have been reasonably possible. Thus, we conclude that the incorrect nature of McGinnis' testimony on this point was made quite clear to the jury so that any deficiency by trial counsel in this regard does not warrant reversal based on ineffective assistance; there is no reasonable probability that but for such a deficiency the outcome of the trial would have been different. *Pickens, supra.*

Defendant also argues that trial counsel provided ineffective assistance by failing to present expert psychological testimony about how the circumstances of the incident could have impaired McGinnis' perception, memory, and ability to recognize the shooter. Trial counsel's conduct in this regard is presumed to be a permissible exercise of trial strategy. *People v Johnson*, 451 Mich 115, 124; 545 NW2d 637 (1996). Defendant has not overcome that presumption. Throughout his cross-examination of McGinnis, trial counsel elicited apparent discrepancies and arguable bases for regarding McGinnis' identification of defendant as the shooter to be suspect. Trial counsel may reasonably have been concerned that the jury would react negatively to perhaps lengthy expert testimony that it may have regarded as only stating the obvious: memories and perceptions are sometimes inaccurate.

Next, defendant argues that trial counsel failed to investigate whether McGinnis was intoxicated at the time of the incident. However, the record does not reflect what steps, if any, trial counsel may have taken to investigate this matter. Further, trial counsel elicited testimony from McGinnis that he had a beer at a club with his friends before the incident. Thus,

defendant has not shown a reasonable probability that differing conduct by trial counsel in this regard would have resulted in a different trial outcome. *Pickens, supra.*

Finally, incorporating by reference the preceding issue, defendant argues that trial counsel provided ineffective assistance by failing to seek proper jury instructions regarding reasonable doubt and identification. However, as we discuss above, the trial court did not err in its jury instructions with regard to these matters. Thus, trial counsel did not provide ineffective assistance by failing to seek different conduct by the trial court in this regard. *Pickens, supra.*

### VI. ALLEGED FAILURE TO DETERMINE IF DEFENDANT WAIVED CONFRONTATION RIGHTS

Defendant argues that the trial court erred in failing to advise defendant of his right to cross-examine witnesses whose production was waived by trial defense counsel. In other words, defendant argues that his conviction should be reversed because, without an express waiver, he was denied the right to cross-examine witnesses who were never called by the prosecution. However, the right to confrontation is not violated by the prosecution failing to call witnesses that defendant could have called to testify. *People v Lee,* 212 Mich App 228, 257; 537 NW2d 233 (1995). Thus, defendant has not established any error based on this issue.

### VII. CUMULATIVE ERROR

Defendant argues that the cumulative effect of the errors alleged previously denied him a fair trial. While

the cumulative effect of a number of minor errors may in some cases amount to error requiring reversal, *People v Daoust*, 228 Mich App 1, 16; 577 NW2d 179 (1998), as we discuss above, the areas in which there were errors or arguable errors related to defendant's trial were of little consequence. Thus, reversal of defendant's convictions is not warranted on the basis of cumulative error.

### VIII. CONSTITUTIONALITY OF DETERMINATE SENTENCING FOR FELONY-FIREARM

As required by MCL 750.227b; MSA 28.424(2), defendant was sentenced to a two-year determinate sentence for felony-firearm.[3] In other words, defendant was sentenced to a fixed term of two years' imprisonment for that crime, as opposed to the common sentencing scheme in this state of indeterminate sentencing with a minimum sentence component and a maximum sentence component to a particular criminal sentence. Defendant argues that the requirement of determinate, rather than indeterminate, sentencing by MCL 750.227b; MSA 28.424(2) violates the Michigan Constitution. Defendant asserts, "[t]he two-year mandatory, non-parolable sentence under the felony firearm statute is a 'determinate sentence' which the legislature has no power to impose, under Const 1963, art 4, § 45." We disagree.

Const 1963, art 4, § 45 provides:

---

[3] In pertinent part, MCL 750.227b(1); MSA 28.424(2)(1) provides, "A person who carries or has in his or her possession a firearm when he or she commits or attempts to commit a felony, except [certain specified felonies], is guilty of a felony, and shall be imprisoned for 2 years."

> The legislature may provide for indeterminate sentences as punishment for crime and for the detention and release of persons imprisoned or detained under such sentences.

While this constitutional provision plainly authorizes indeterminate sentencing, it includes no *prohibition* against a statute *requiring* determinate sentencing as a punishment for crime.

Moreover, the history underlying Const 1963, art 4, § 45 does not support a conclusion that it bars determinate sentencing. In *People v Cummings*, 88 Mich 249; 50 NW 310 (1891), the Michigan Supreme Court held that an indeterminate sentence act adopted on July 1, 1889, was unconstitutional, in essence because it violated the separation of powers. Thereafter, a constitutional amendment of the Michigan Constitution of 1850 was adopted at an election in November 1902 with language substantively identical to Const 1963, art 4, § 45 that authorized the Legislature to provide for indeterminate sentences. See *In re Campbell*, 138 Mich 597, 601-602; 101 NW 826 (1904).[4] Similarly, a provision, substantively identical to Const 1963, art 4, § 45, expressly authorizing the Legislature to provide for indeterminate sentencing was included in the Michigan Constitution of 1908, which was in force between the 1850 Constitution and the present Michigan Constitution. Const 1908, art 5, § 28.[5]

---

[4] Const 1850, art 4, § 47 provided:

The legislature may, by law, provide for the indeterminate sentences, so called, as a punishment for crime, on conviction thereof, and for the detention and release of persons imprisoned or detained on said sentences.

[5] Const 1908, art 5, § 28 provided:

In light of this historical background, the Legislature was recognized as having the power to provide for determinate sentences as punishment for crime before the inclusion of a provision in a prior state constitution allowing the Legislature to provide for indeterminate sentencing. The initial inclusion of such a constitutional provision was a response to the holding in *Cummings* that indeterminate sentencing was unconstitutional. Thus, Const 1963, art 4, § 45 reflects an *expansion* of legislative power to include the power to provide for indeterminate sentences for crimes, not a *removal of* the previously existing power to provide for determinate sentences. Moreover, we take notice that since the adoption of the first state constitutional provision allowing indeterminate sentencing, the Legislature has enacted numerous statutes allowing imposition of determinate sentences as punishment for crimes, particularly for misdemeanors that might be punished with a term of days in jail. This reflects that the drafters of Const 1963, art 4, § 45, and its preceding analogous constitutional provisions, did not intend to bar determinate sentencing.

Further, and most fundamentally, defendant's position rests on a flawed premise about the extent of the legislative power of the state. Defendant states in the pertinent argument section of his supplemental brief, "Nowhere does the [Michigan] Constitution expressly confer on the Legislature the power to impose determinate sentences, and this Court should not lightly presume that such a power is implied. The Constitu-

---

The legislature may provide by law for indeterminate sentences, so called, as a punishment for crime, on conviction thereof, and for the detention and release of persons imprisoned or detained on said sentences.

tion must therefore be interpreted to bar determinate sentences." Contrary to defendant's position, an enacted state statute does *not* require express authorization by a provision of the Michigan Constitution. Rather, as explained by the Michigan Supreme Court decades ago:

> A different rule of construction applies to the Constitution of the United States than to the Constitution of a State. The Federal government is one of delegated powers, and all powers not delegated are reserved to the States or to the people. When the validity of an act of congress is challenged as unconstitutional, it is necessary to determine whether the power to enact it has been expressly or impliedly delegated to congress. The legislative power, under the Constitution of the State, is as broad, comprehensive, absolute and unlimited as that of the parliament of England, subject only to the Constitution of the United States and the restraints and limitations imposed by the people upon such power by the Constitution of the State itself. [*Young v Ann Arbor*, 267 Mich 241, 243; 255 NW 579 (1934).]

See also *Southeastern Michigan Fair Budget Coalition v Killeen*, 153 Mich App 370, 380; 395 NW2d 325 (1986) ("[s]tate constitutions . . . serve as limitations on the otherwise plenary power of state governments"). Stated even more succinctly, "the Legislature can do *anything* which it is not prohibited from doing by the people through the federal and state constitutions." *Id.* (emphasis supplied).

Accordingly, an enacted statute in force regarding *any* subject or establishing *any* type of rule is valid as long as it does not contravene a provision of the

Michigan Constitution or federal law.[6] In sum, because nothing in the Michigan Constitution or federal law prohibits the imposition of a determinate sentence as a punishment for a crime, the requirement of MCL 750.227b; MSA 28.424(2) that felony-firearm be punished by imposition of a determinate sentence is constitutional.

Affirmed.

CAVANAGH, P.J., concurred.

HOLBROOK, JR., J., I concur in the result only.

.

---

[6] We, of course, are addressing the legal power of the state under Michigan law, not the proper exercise of that power. We do not suggest that the Legislature should actually regard itself as free of any constraints on its actions other than the limits imposed by the Michigan Constitution and federal law. These, however, are matters for the Legislature itself to determine, according to properly adopted procedures and the individual beliefs of its members. Under commonly accepted separation of powers principles, it is not our role to sit in judgment as a "Super Legislature" on such matters.