# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

JEMARCUS JOVON WATKINS,

        Defendant-Appellant.

UNPUBLISHED
July 9, 2015

No. 320318
Saginaw Circuit Court
LC No. 13-038965-FC

Before: O'CONNELL, P.J., and OWENS and M. J. KELLY, JJ.

PER CURIAM.

Defendant, Jemarcus Jovon Watkins, appeals as of right his convictions, following a jury trial, of conspiracy to commit murder, MCL 750.157a and MCL 750.316(a), first-degree arson, MCL 750.72, conspiracy to commit first-degree arson, MCL 570.157a and MCL 750.72, threatening a witness, MCL 750.122(7)(c), six counts of assault with intent to commit murder, MCL 750.83, and five counts of possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b. The trial court sentenced Watkins to serve terms of life imprisonment for conspiracy to commit murder, 13 years to 40 years' imprisonment for conspiracy to commit arson, 37 years and five months' to 80 years' imprisonment for arson and each assault, nine years and six months' to 15 years' imprisonment for witness threatening, and a consecutive term of two years' imprisonment for his felony-firearm convictions. We affirm.

## I. FACTS

Jeremy Prince testified that he attended middle school and high school with Watkins, codefendant John Henry Granderson,[1] and Anterio Patton. According to Prince, he attended a pre-prom party in May 2013. During the party, there was a commotion involving Patton. Phillip Hudson, a friend of Patton, testified that Patton and Evillis McGee "had a problem with each other." According to Prince, someone fired 12 or 13 shots into the crowd during the pre-prom party and Ne-Ne McKinley was killed.

---

[1] This panel is also considering Granderson's appeal of his convictions for the same offenses.

Patton's mother testified that she was present at the pre-prom party with Patton. According to Patton's mother, she had just given Patton a hug when "the crowd went to backing up, and I seen some guys with some guns." The men with guns began shooting. Patton's sister testified that she was also at the pre-prom party and saw Watkins, Karon Thomas, and two other men shoot into the crowd.

Saginaw City Police Detective Matthew Gerow testified that he investigated the pre-prom shooting. According to Detective Gerow, McGee and Thomas were charged with murder in connection with McKinley's death. Detective Gerow testified that Patton testified at McGee and Thomas's preliminary examination. Patton's mother testified that Patton intended to testify at the murder trial on July 26, 2013.

Patton's home was attacked early in the morning on July 11, 2013. According to Prince, a friend dropped him off near Patton's home to meet his ex-girlfriend, who was at Patton's house. Prince saw an unfamiliar van driving in the neighborhood. Patton was not there at the time, but Patton's family and some friends were present. At about 12:30 a.m., a van drove by the house. About three minutes later, he saw someone approach the house with something in one hand. Prince yelled, grabbed his ex-girlfriend, and then heard "the loudest bang I ever heard in my life." Prince realized that he, his ex-girlfriend, and the house were on fire. The people outside began shooting at the house.

Prince extinguished the fire that was on him and then went to retrieve a gun. When he looked outside, he saw that the front of the house was on fire and Granderson was shooting an assault-style rifle at the house. Prince tried to get everyone into the house's basement, but once there, he realized that his ex-girlfriend was not present. Prince went back upstairs to find her and saw someone enter the home carrying a handgun:

> He was like right there on the porch, coming into the door, but I see him, but he's look around like, and I see him. . . . [W]hen we made eye contact, his eyes got big, because I was shocked about who I seen.

Prince then testified that the person was Watkins, who ran back outside. Prince found his ex-girlfriend and went into the basement to wait for police and firefighters to arrive. Prince believed Granderson and Watkins had set the house on fire and then waited for the occupants to come outside so that they could "pick [them] off." The recording of a 9-1-1 call that was placed from the home's basement from 1:54 a.m. to 2:03 a.m. was admitted into evidence.

Alexia Lewis testified that she lived across the street from Patton's home, and she was visiting the home at the time of the arson. According to Lewis, she heard her father's voice outside when she was hiding in the basement. When her father saw her, he was "[s]hocked."

Granderson testified that on the night of the arson, he was at his sister's home in the Sheridan Park neighborhood. Granderson's alibi defense centered on watching the child of his sister's friend, Ja'Quise O'Daniels, while O'Daniels shopped for groceries. On cross-examination, O'Daniels testified that she was mistaken about which day it was that Granderson watched her child.

Lauren Davis, the mother of Watkins's child, testified that at about 2:25 a.m. on July 11, 2013, Watkins asked her to pick him up from a home in northwest Sheridan Park. Davis testified that Watkins did not smell of smoke or gasoline and did not have a weapon when she picked him up. Davis stated that she did not know where Watkins was from 1:45 a.m. to 2:00 a.m.

The jury found Watkins guilty of the crimes previously described. Before his sentencing hearing, Watkins moved for a new trial on the basis of newly discovered evidence. At the hearing on the motion, Watkins's mother testified that Prince told her that he intended to recant his trial testimony. Defense counsel testified that he prepared an affidavit for Prince to sign, but Prince later recanted his recantation. The prosecution presented evidence that Prince told a police detective that he had refused to sign the affidavit because it was untrue. The trial court found that Prince's testimony at trial was credible and denied Watkins's motion for a new trial.

## II. EVIDENTIARY ISSUES

### A. STANDARDS OF REVIEW

This Court reviews for an abuse of discretion preserved challenges to the trial court's evidentiary rulings. *People v Duncan*, 494 Mich 713, 722; 835 NW2d 399 (2013). The trial court abuses its discretion when its outcome falls outside the range of principled outcomes. *People v Babcock*, 469 Mich 247, 269; 666 NW2d 231 (2003). We review de novo the preliminary questions of law surrounding the admission of evidence. *Duncan*, 494 Mich at 723.

### B. GANG-RELATED PHOTOGRAPHS

Watkins contends that the trial court erred by admitting various gang-related photographs because they were irrelevant and unfairly prejudicial. We disagree.

The Michigan and United States Constitutions provide that no person shall be deprived of property without due process of law. US Const, Am XIV; Const 1963, art 1, § 17. Criminal prosecutions must comply with " 'prevailing notions of fundamental fairness.' " *People v Anstey*, 476 Mich 436, 460; 719 NW2d 579 (2006), quoting *Pennsylvania v Ritchie*, 480 US 39, 56; 107 S Ct 989; 94 L Ed 2d 40 (1987). The improper admission of evidence may deprive a defendant of due process if it "infused the trial with unfairness." *Estelle v McGuire*, 502 US 62, 75; 112 S Ct 475; 116 L Ed 2d 385 (1991) (quotation marks and citation omitted).

The trial court may only admit relevant evidence. MRE 402. Evidence may be relevant even when it does not pertain to an element of an offense, as long as it pertains to a matter in controversy. *People v McGhee*, 268 Mich App 600, 637; 709 NW2d 595 (2005). The res gestae of a crime includes the facts and circumstances surrounding its commission. *People v Sholl*, 453 Mich 730, 742; 556 NW2d 851 (1996); *US v Hardy*, 228 F3d 745, 748 (CA 6, 2000). The res gestae of an offense is generally relevant and admissible. *Sholl*, 453 Mich at 741; *Hardy*, 228 F3d at 748.

A person's motive to commit a crime may be highly relevant. *People v Fisher*, 449 Mich 441, 453; 537 NW2d 577 (1995). Additionally, evidence that affects the credibility of a witness is also highly relevant. *People v King*, 297 Mich App 465, 476-477; 824 NW2d 258 (2012). The fact that evidence is damaging does not make it unfairly prejudicial. *People v Mills*, 450

Mich 61, 75; 537 NW2d 909 (2008). Evidence is unfairly prejudicial when evidence is only marginally probative, but there is a danger that the trier of fact may give it undue or preemptive weight. *People v Blackston*, 481 Mich 451, 462; 751 NW2d 408 (2008).

In this case, the photographs established Watkins's relationship to people who were going to be standing trial for murder two weeks after the offense. The intended victim of the arson was a person who intended to testify at that trial. The photographs therefore established the motive for the crime and were thus highly relevant. The gang-related hand symbols that some people in the photographs displayed also established their relationship. There is also no indication that the jury gave this evidence undue or preemptive weight. We conclude that the trial court did not abuse its discretion by admitting the photographs.

Watkins also contends that admission of the photographs improperly implied guilt by association, in violation of the Michigan Supreme Court's decision in *People v Bynum*, 496 Mich 610; 852 NW2d 570 (2014). We disagree.

In *Bynum*, the Michigan Supreme Court considered the relevance of expert testimony evidence regarding gangs, gang membership, and gang culture. *Id*. at 615. It concluded that the trial court may admit expert testimony when there is "evidence that the crime at issue is gang-related," but that an expert "may not use a defendant's gang membership to prove specific instances of conduct in conformity with gang membership . . . ." *Id*. at 615, 635-636.

This case is highly distinguishable from *Bynum*. This case involved no expert testimony regarding gang affiliation, only lay witness testimony. There was extensive evidence that the crime at issue in this case was gang-related—indeed, the res gestae evidence established that the arson was part of a witness intimidation attempt regarding a gang-related murder. Finally, the evidence was not used to show that Watkins's conduct conformed to general gang-related conduct. *Bynum* did not mandate exclusion of this evidence.

## C. PRIOR INCONSISTENT STATEMENT

Watkins contends that the trial court erred by admitting Detective Charles Coleman's testimony about Prince's statements in the hospital because this prior consistent statement improperly bolstered Prince's testimony. We disagree.

Hearsay is "a statement, other than the one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." MRE 801(c). Hearsay is generally inadmissible, unless it is subject to a hearsay exception. MRE 802; *Duncan*, 494 Mich at 724. The improper admission of hearsay may implicate the defendant's state and federal constitutional rights. *People v Dendel (On Second Remand)*, 289 Mich App 445, 452-453; 797 NW2d 645 (2010). See *Crawford v Washington*, 541 US 36, 50-51; 124 S Ct 1354; 158 L Ed 2d 177 (2004).

MRE 801(d)(1)(B) provides that a prior statement of a witness is not hearsay if the prior statement was "consistent with the declarant's testimony and is offered to rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive . . . ." However, one of the elements the prosecution must establish to admit a prior consistent statement is that the statement was made "prior to the time that the supposed motive to falsify

-4-

arose." *People v Jones*, 240 Mich App 704, 707; 613 NW2d 411 (2000) (quotation marks and citation omitted). In this case, it is clear that the alleged motive to fabricate—that Watkins and Granderson shot Prince in the leg the previous year—arose before Prince made his statements to Detective Coleman. Therefore, the fourth element would not be established in this case.

However, a party may not "create[] the very error that it wishes to correct on appeal[.]" *People v Szalma*, 487 Mich 708, 726; 790 NW2d 662 (2010). "Under the doctrine of invited error, a party waives the right to seek appellate review when the party's own conduct directly causes the error." *People v McPherson*, 263 Mich App 124, 139; 687 NW2d 370 (2004).

We note that counsel for Granderson challenged Detective Coleman's testimony. Counsel for Watkins did not challenge the testimony. In his opening statement, counsel for Granderson had previously stated the following:

> Mr. Prince has been interviewed a number of times and he said a number of different things. At one point he told the investigator he was 70 percent sure . . . that the two people shooting at the house, and again earlier he had said there were three, 70 percent sure it was John Granderson and Mr. Watkins.
>
> There have been other hearings in this case, you know. There was a preliminary exam before we got to that point, and at that point he's saying he was 100 percent sure, but back when Mr. Prince was being treated at Covenant Hospital, so this would have been the night of the shooting, July 11th, he told Detective Coleman that [Watkins] was the one doing the shooting and he did not know who threw the cocktail.
>
> As part of his interview with Detective Coleman, he related that he had been shot a year ago in Buena Vista and believed he'd been shot by the same people who shot up the house this particular night.

Detective Coleman subsequently testified that he was the first officer to interview Prince in the hospital. According to Detective Coleman, Prince told him that Watkins and Granderson got out of a van, Watkins was shooting, and he did not know who threw the Molotov cocktail. On cross-examination, Detective Coleman testified that Prince told him that the arson incident was the second time that Watkins and Granderson had shot him.

We conclude that by stating in his opening that Detective Coleman would testify about Prince's prior statements, counsel waived this alleged error. Prior to his objection, counsel indicated in his opening statement that the jury would hear Prince's prior statements to police officers. The prosecution clearly relied on this statement while questioning Detective Coleman. Watkins's attempt to characterize the prosecution's questioning as "bolstering" on appeal is disingenuous.

We also note that while Watkins mentions the testimonies of Officer Matthew Carpus and Trooper Hillary House in his argument, he does not develop an argument regarding them. We therefore decline to analyze these issues because we conclude that Watkins has abandoned them. See *People v Matuszak*, 263 Mich App 42, 59; 687 NW2d 342 (2004). However, even were we to analyze these issues, we would reach the same conclusion.

## III. PROSECUTORIAL MISCONDUCT

Watkins contends that the prosecution committed misconduct by commenting on his failure to present an alibi witness. We disagree.

A defendant must "timely and specifically" challenge alleged prosecutorial misconduct before the trial court. *People v Unger*, 278 Mich App 210, 234-235; 749 NW2d 272 (2008). In this case, Watkins did not challenge the statement when the prosecutor made it. Therefore, it is unpreserved, and we will review this claim for plain error. See *id.* at 235.

A prosecutor can deny a defendant's right to a fair trial by making improper remarks that infringe on a defendant's constitutional rights or by making remarks that "so infect[] the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly v DeChristoforo*, 416 US 637, 643; 94 S Ct 1868; 40 L Ed 2d 431 (1974). See *People v Bahoda*, 448 Mich 261, 266-267; 531 NW2d 659 (1995). Generally, the prosecution may argue all the facts in evidence and all reasonable inferences arising from them, as they relate to the prosecution's theory of the case. *Bahoda*, 448 Mich at 282. If the defendant presents evidence of an alibi, the prosecution may remark on the lack of corroborating testimony. *People v Ovegian*, 106 Mich App 279, 281; 307 NW2d 472 (1981). But if the defendant does not present an alibi defense, the prosecution's remark about a defendant's lack of alibi is improper. *Id.* The prosecution may not shift the burden of proof by commenting on the defendant's failure to present evidence. *People v Abraham*, 256 Mich App 265, 273; 662 NW2d 836 (2003).

In this case, the prosecution argued as follows:

> His girlfriend Lauren said . . . it's like early in the morning, 2:24, 2:25, . . . and I get a call from [Watkins] and he's someplace where I don't even know where he's at. . . .

> He wasn't at home. He was at some stranger's house apparently. What's he doing at some stranger's house, and why does he need a ride at almost 2:30 in the morning . . . . Lauren, to her credit, well, you don't know where he was at the time when all this happened, do you? Can't tell you. Does not have an alibi.

Watkins did not argue that he had an alibi at the time of the incident; rather, he relied on a theory of mistaken identification. The prosecution's remark on Watkins's failure to present an alibi was improper because Watkins had not presented an alibi defense.

However, Watkins did not timely challenge this alleged misconduct. Curative instructions are "sufficient to cure the prejudicial effect of most inappropriate prosecutorial statements." *Unger*, 278 Mich App at 235. We will not find error requiring reversal if a curative instruction could have alleviated the effect of the prosecutor's misconduct. *Id.*

In this case, the prosecution's remark was brief. Read in context, it was a part of the prosecutor's general commentary on the weakness of Davis's evidence that Watkins was somewhere other than Patton's house during the arson. Most importantly, a timely curative instruction would have alleviated the prejudicial effect of this remark, and the trial court later instructed the jury that the burden of proof rested on the prosecution and that Watkins was not

required to prove his innocence. We conclude that this error does not warrant reversal because it is not likely that it prejudiced Watkins's trial.

## IV. INEFFECTIVE ASSISTANCE

### A. STANDARDS

A criminal defendant has the fundamental right to effective assistance of counsel. US Const, Am VI; Const 1963, art 1, § 20; *United States v Cronic*, 466 US 648, 654; 104 S Ct 2039; 80 L Ed 2d 657 (1984). A defendant's ineffective assistance of counsel claim "is a mixed question of fact and constitutional law." *People v LeBlanc*, 465 Mich 575, 579; 640 NW2d 246 (2002). When reviewing an ineffective assistance of counsel claim, this Court reviews for clear error the trial court's findings of fact and reviews de novo questions of law. *Id*.

We note that Watkins has preserved this issue by moving for an evidentiary hearing. See *People v Ginther*, 390 Mich 436, 443; 212 NW2d 922 (1973). When the trial court has not conducted a hearing to determine whether a defendant's counsel was ineffective, we conduct our review from the existing record. *People v Riley (After Remand)*, 468 Mich 135, 139; 659 NW2d 611 (2003).

To prove that his defense counsel was not effective, the defendant must show that (1) defense counsel's performance fell below an objective standard of reasonableness, and (2) there is a reasonable probability that counsel's deficient performance prejudiced the defendant. *Strickland v Washington*, 466 US 668, 694; 104 S Ct 2052; 80 L Ed 2d 674 (1984); *People v Pickens*, 446 Mich 298, 302-303; 521 NW2d 797 (1994). The defendant must overcome the strong presumption that defense counsel's performance constituted sound trial strategy. *Strickland*, 466 US at 690; *Matuszak*, 263 Mich App at 58. A defendant was prejudiced if, but for defense counsel's errors, the result of the proceeding would have been different. *Pickens*, 446 Mich at 312.

### B. CELL PHONE RECORDS

Watkins contends that defense counsel erred by failing to present evidence of Watkins's cellular phone records on June 11, 2013. We disagree.

Defense counsel may be ineffective for failing to reasonably investigate a defendant's substantial defenses. See *Strickland*, 466 US at 691. However, what evidence to present is a matter of trial strategy. *People v Horn*, 279 Mich App 31, 39; 755 NW2d 212 (2008).

In this case, Watkins's cellular phone records showed two calls at 12:56 a.m. and 2:37 a.m. respectively. A police report indicated that the phone records offered "no definitive cellular phone call evidence to place the handset at or away from the scene of the crime" because of the "lack of calls nearer to the time of the incident[.]" While Watkins contends on appeal that this evidence was exculpatory, that is not the case: at best, the witness could have testified that he could not tell from the cell phone records where Watkins was located during the crime.

We conclude that trial counsel was not ineffective. Counsel's decision not to present this evidence was sound strategy because it was not exculpatory. Further, even had trial counsel presented this evidence, the results of Watkins's proceedings would not have been different.

## C. SEPARATE TRIALS

Watkins contends that trial counsel was ineffective for failing to move to separate his trial from that of codefendant Granderson. We disagree.

The trial court may permissively order separate trials if severance "will promote fairness to the parties and a fair determination of the guilt or innocence of one or more of the defendants." MCR 6.210(D). Before permissively ordering severance, the trial court should consider "the timeliness of the motion, the drain on the parties' resources, the potential for confusion or prejudice stemming from either the number of defendants or the complexity or nature of the evidence, the convenience of witnesses, and the parties' readiness for trial." MCR 6.210(D).

"Joinder of . . . other crimes cannot prejudice the defendant more than he would have been by the admissibility of the other evidence in a separate trial." *People v Williams*, 483 Mich 226, 237; 769 NW2d 605 (2009), quoting *United States v Harris*, 635 F2d 526, 527 (CA 6, 1980) (alteration and quotation marks omitted). A defendant is also prejudiced by a joint trial when it restricts the defendant's ability to present a defense. *People v Hana*, 447 Mich 325, 360; 524 NW2d 682, amended 447 Mich 1203 (1994). A defendant's ability to present a defense is restricted when codefendants present mutually antagonistic defenses. *Id*. at 349.

In this case, Watkins and Granderson did not present mutually antagonistic defenses: Watkins's theory was that he was misidentified as being present, and Granderson's theory was that he was not present. A full reading of Granderson's opening statement indicates that he did not inculpate Watkins. Instead, he accurately summarized the expected testimony in the case. Neither defense implicated the other defendant.

Watkins contends that Granderson's failed alibi defense may have prejudiced the jurors against his case because Granderson blatantly lied to the jury. Granderson's alibi witness testified that she was mistaken, not that the alibi was fabricated. Watkins also contends that the jury was prejudicially exposed to gang-related photographs involving Granderson that would otherwise have been inadmissible. Watkins does not address how the photographs of Granderson with East Side gang members were more prejudicial to his case than the photographs of Watkins with similar associates, which were properly admitted. "[I]ncidental spillover prejudice, which is almost inevitable in a multi-defendant trial, does not suffice." *Hana*, 447 Mich at 349 (internal quotation marks and citations omitted). We are not convinced that the jury gave undue or preemptive weight to the photographs involving Granderson alone, rather than those involving Watkins.

In sum, we are not convinced that the trial court's decision not to move for separate trials was an unreasonable trial strategy or prejudiced Watkins. We conclude that counsel rendered effective assistance.

## D. EXPERT IDENTIFICATION WITNESS

Watkins contends that trial counsel was ineffective for failing to present an expert witness in eyewitness identification. Again, we disagree.

"The vagaries of eyewitness identification are well-known; the annals of criminal law are rife with instances of mistaken identification." *United States v Wade*, 388 US 218, 228; 87 S Ct 1926; 18 L Ed 2d 1149 (1967). However, as stated above, what evidence to present is a matter of trial strategy. *Horn*, 279 Mich App 39. Trial counsel may reasonably decide against presenting an expert witness in identification because counsel "may reasonably have been concerned that the jury would react negatively to perhaps lengthy expert testimony that it may have regarded as only stating the obvious: memories and perceptions are sometimes inaccurate." *People v Cooper*, 236 Mich App 643, 658; 601 NW2d 409 (1999).

We conclude that trial counsel did not render ineffective assistance when he did not present an eyewitness identification expert. This case involved only one eyewitness—Prince, who claimed that he saw Watkins while he attempted to retrieve his girlfriend. Prince was familiar with Watkins, and they had an extensive personal history. Trial counsel ably attacked Prince's testimony both by cross-examination and the presentation of other witnesses, including through Davis's testimony that Prince never went back upstairs but instead remained in the basement. Considering the abundant impeachment evidence available, counsel's strategic decision to forego an eyewitness identification expert was reasonable. Further, we are not convinced that the results of Watkins's proceeding would have been different had such an expert testified.

## V. NEWLY DISCOVERED EVIDENCE

Watkins contends that the trial court erred when it denied his motion for a new trial on the basis of newly discovered evidence. We disagree.

This Court reviews for an abuse of discretion the trial court's decision on a motion for a new trial. *People v Cress*, 468 Mich 678, 691; 664 NW2d 174 (2003). We review the trial court's underlying factual findings for clear error. *Id*. at 691. A finding is clearly erroneous if, after reviewing the entire record, we are definitely and firmly convinced that the trial court made a mistake. *People v Reese*, 491 Mich 127, 139; 815 NW2d 85 (2012). When considering whether a finding is clearly erroneous, this Court gives due regard to the trial court's credibility determinations. *People v Canter*, 197 Mich App 550, 560; 496 NW2d 336 (1992).

The trial court may grant a defendant a new trial on the basis of newly discovered evidence. See *Cress*, 468 Mich at 692. But "where newly discovered evidence takes the form of recantation testimony, it is traditionally regarded as suspect and untrustworthy." *Canter*, 197 Mich App at 559. "There is no form of proof so unreliable as recanting testimony." *Id*. (quotation marks and citations omitted).

Our review of the record indicates that the trial court applied the proper standard when determining whether to grant a new trial. It considered that, despite Prince's recantation, Prince refused to sign an affidavit recanting his testimony and later indicated that his recantation was not true. The trial court found that Prince was initially a credible witness. We are not definitely and firmly convinced that the trial court made a mistake. Further, particularly given Prince's

recantation of his recantation, we conclude that the trial court did not abuse its discretion when it refused to grant a new trial on this ground.

## VI. SENTENCING

This Court reviews the sentencing court's scoring of a sentencing guidelines variable for clear error. *People v Osantowski*, 481 Mich 103, 111; 748 NW2d 799 (2008). A preponderance of the evidence must support the trial court's determinations. *Id*. The proper interpretation and application of the sentencing guidelines is a question of law that this Court reviews de novo. *People v Morson*, 471 Mich 248, 255; 685 NW2d 203 (2004).

First, Watkins contends that the trial court erroneously assessed 15 points for offense variable (OV) 5. We agree.

The trial court must assess 15 points for OV 5 if "[s]erious psychological injury requiring professional treatment occurred to a victim's family." MCL 777.35(1)(a). The trial court must assess zero points for OV 5 if "[n]o serious psychological injury requiring professional treatment occurred to a victim's family." MCL 777.35(1)(b). Whether a victim has in fact sought treatment is not determinative. MCL 777.35(2).

However, the trial court improperly assesses points for psychological injuries if there is *no* evidence of any psychological injury, because the trial court may not assume that an injury occurred. See *People v Lockett*, 295 Mich App 165, 183; 814 NW2d 295 (2012) (concerning OV 4). Evidence of psychological injuries may include evidence of, among other possible psychological effects, personality changes, anger, fright, or feelings of being hurt, unsafe, or violated. *People v Gibbs*, 299 Mich App 473, 493; 830 NW2d 821 (2013).

In this case, the trial court relied on the psychological effect on Lewis's father to score OV 15. The only evidence of his psychological state was Lewis's statement that her father was "shocked" on seeing her emerge from the building. Lewis's father did not give a victim impact statement, and he did not testify at Watkins's trial. While Lewis's father may have been shocked to see her emerge from the building, the trial court may not simply assume that Lewis's father suffered a serious psychological injury. We conclude that the trial court improperly assessed 15 points for OV 5 on this basis.

Second, Watkins contends that the trial court improperly assessed 15 points for OV 10. We disagree.

The trial court must assess 15 points under OV 10 if "[p]redatory conduct was involved." MCL 777.40(1)(a). The statute defines predatory conduct as "preoffense conduct directed at a victim . . . for the primary purpose of victimization. MCL 777.40(3)(a). The Michigan Supreme Court has provided standards to help a trial court determine whether it should assess points for predatory conduct:

> (1) Did the offender engage in conduct before the commission of the offense?

(2) Was this conduct directed at one or more specific victims who suffered from a readily apparent susceptibility to injury, physical restraint, persuasion, or temptation?

(3) Was victimization the offender's primary purpose for engaging in the preoffense conduct?

If the court can answer all these questions affirmatively, then it may properly assess 15 points for OV 10 because the offender engaged in predatory conduct under MCL 777.40. [*People v Cannon*, 481 Mich 152, 161-162; 749 NW2d 257 (2008).]

The conduct may not be "preoffense conduct involving nothing more than run-of-the-mill planning to effect a crime or subsequently escape without detection." *People v Huston*, 489 Mich 451, 462; 802 NW2d 261 (2011) (quotation marks and citation omitted). Vulnerabilities may arise out of a victim's relationships or circumstances, as well as the victim's characteristics. *Id*. at 464.

In this case, Prince testified that he saw a van driving in the neighborhood earlier in the evening. The attack took place while everyone in the home was in a single room adjacent to the front of the home. Further, Prince testified that he believed that the attackers set the house on fire with the intent of shooting the victims as they attempted to escape. It is a reasonable inference from the evidence that Watkins monitored the house and waited to instigate the arson until the home's occupants were in a vulnerable location. Further, the home being on fire certainly rendered the victims more vulnerable to being shot at. We conclude that a preponderance of the evidence supported the trial court's determination that the defendants in this case engaged in predatory conduct.

Third, Watkins contends that the trial court erred when it assessed 100 points for OV 20. We disagree.

The trial court properly assesses 100 points for OV 20 when "[t]he offender committed an act of terrorism by using or threatening to use a harmful . . . incendiary device, or explosive device[.]" MCL 777.49a(1)(a). An act of terrorism is a violent felony that is dangerous to human life and that "is intended to intimidate or coerce a civilian population . . . ." MCL 777.49a(2)(a); 750.543b.

Here, Watkins was part of a group of men who set a house on fire with an incendiary device. The home was owned by Patton, a person who intended to testify at a murder trial involving one of Watkins's associates. Based on the evidence available in this case, a preponderance of evidence supported the finding that the defendants intended the act to intimidate or coerce a civilian population—namely, anyone who would act as a witness against them. We conclude that the trial court did not err by assessing 100 points for OV 20.

If a sentencing error results in a different sentencing guidelines range, the defendant is entitled to resentencing. *People v Jackson*, 487 Mich 783, 793-794; 790 NW2d 340 (2010). In this case, Watkins had 265 OV points, placing him within OV Level VI. See MCL 777.62. Reducing his OV 5 assessment to 0 points reduces his overall OV points to 250, still placing him

within OV Level VI.  Because Watkins's OV level has not changed, resentencing is not necessary.  See *People v Francisco,* 474 Mich 82, 89 n 8; 711 NW2d 44 (2006).

## VII. CONCLUSION

We conclude that the strategic decisions of Watkins's trial counsel were objectively reasonable and did not prejudice the outcome of his trial.  We also conclude that the trial court did not abuse its discretion by refusing Watkins's motion for a new trial or by admitting evidence of gang-related photographs and Prince's prior consistent statements.  We conclude that the prosecution's brief reference to Watkins's lack of alibi could have been cured by a timely curative instruction and was not overly prejudicial.  Because we have only determined that one non-prejudicial error existed, we also conclude that no cumulative errors warrant relief.  See *People v Cooper*, 236 Mich App 643, 659-660; 601 NW2d 409 (1999).  Finally, while the trial court erred by assessing 15 points for OV 5, this error does not warrant resentencing.

We affirm.

/s/ Peter D. O'Connell
/s/ Donald S. Owens
/s/ Michael J. Kelly