# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

WILLIAM DESHIREE THOMAS,

        Defendant-Appellant.

UNPUBLISHED
November 10, 2015

No. 321822
Ingham Circuit Court
LC No. 12-000390-FC

Before: GADOLA, P.J., and HOEKSTRA and M. J. KELLY, JJ.

PER CURIAM.

Defendant, William Deshiree Thomas, appeals by right his jury convictions of first-degree criminal sexual conduct, MCL 750.520b(1)(e), and first-degree home invasion, MCL 750.110a(2). Because we conclude there were no errors warranting a new trial or other relief, we affirm.

## I. BASIC FACTS

In March 2012, the victim heard a noise in her home and discovered a man in her kitchen, who she later identified as Thomas. Thomas wore a white mask over his mouth and a white "do-rag" on his head and was armed with a knife. The victim yelled at him to get out and attempted to hit him with an awning crank. Thomas backed the victim into a bedroom and, after a brief struggle there, he ordered her into a bathroom. Thomas shut the bathroom's door and forced the victim to wash.

After compelling her to wash, Thomas ordered her to remove her clothing and lie on the floor. He covered her face with a towel and then forcibly raped her. He then sprayed her with bleach and ordered her into the shower. He stole her purse and told her that if she contacted the police department he would return and kill her.

The victim waited a few moments and peeked around the shower curtain. She testified that she saw the man—without his mask on—frantically searching through the contents of a wastebasket he had overturned. He looked up and ordered her back into the shower. She waited several more minutes and then crept from the shower and called the police department. In addition to the victim's identification, police officers recovered the do-rag and it had a blood stain with DNA that tested consistent with a sample taken from Thomas.

## II. VICTIM'S IDENTIFICATION

Thomas first argues that the trial court erred in denying his motion to suppress the victim's in-court identification. This Court reviews de novo the constitutional standards that apply to the trial court's decision on a motion to suppress, but reviews for clear error the factual findings underlying the decision. *People v Williams*, 472 Mich 308, 313; 696 NW2d 636 (2005).

On the basis of DNA evidence recovered from the scene, officers arrested Thomas. The victim identified Thomas at the preliminary examination but before that, she saw Thomas' photo on the news and once while she was in the police captain's office. Thomas argues that the latter showing amounted to deliberate misconduct calculated to lead the victim to believe that the police officers suspected him.

"A photographic identification procedure violates a defendant's right to due process of law when it is so impermissibly suggestive that it gives rise to a substantial likelihood of misidentification." *People v Gray*, 457 Mich 107, 111; 577 NW2d 92 (1998). "Most eyewitness identifications involve some element of suggestion." *Perry v New Hampshire*, 565 US ___; 132 S Ct 716, 727; 181 L Ed 2d 694 (2012). However, the fact that eyewitness identification is imperfect does not automatically require a trial court to "screen such evidence for reliability before allowing the jury to assess its creditworthiness." *Id*. at ___; 132 S Ct at 728. Instead, "a preliminary judicial inquiry into the reliability of an eyewitness identification" is not required in cases where the "identification was not procured under unnecessarily suggestive circumstances arranged by law enforcement." *Id*. at ___; 132 S Ct at 730.

Thomas argues that the threshold inquiry in *Perry*—whether the identification was "procured under unnecessarily suggestive circumstances arranged by law enforcement"—was satisfied in this case. He argues that law enforcement arranged the identification in the police captain's office by calling the victim to the office, telling her that the officers had an arrest warrant for her assailant on the basis of a DNA match, and then leaving her alone in the office with a photograph of Thomas on a computer screen. Although a police officer contacted the victim and requested her presence at the police station, she was not contacted to make an identification; Thomas had already been identified from the DNA match and there was no evidence that officers wanted the victim to examine the photo or confirm Thomas' identity as her attacker. Instead, it appears that the victim saw the photo by mere happenstance.

The evidence shows that the captain was conversing with the victim when he was interrupted by a phone call. He stepped out of the office to take the call and, while he was absent, the victim noticed Thomas' photo on the computer screen even though the screen was angled away from her. Nothing on this record indicates that law enforcement used unnecessarily suggestive procedures to procure an identification. Accordingly, Thomas has not established the threshold inquiry. There was no need for the trial court to screen the evidence for reliability before permitting it to go before a jury. See *id*. at ___; 132 S Ct at 728. Instead, it was sufficient to allow the reliability of the victim's identification to be tested via "the rights and opportunities generally designed for that purpose." *Id*. at ___; 132 S Ct at 721. Thomas' trial lawyer tested the reliability of the victim's identification by vigorous cross-examination and through several other witnesses. Further, the jury was instructed on how to evaluate witness testimony. Thus, the procedural safeguards highlighted in *Perry* were utilized in this case. *Id*.

The trial court did not err when it refused to suppress the victim's identification.

### III.  EXPERT ON EYEWITNESS IDENTIFICATION

Thomas next argues that the trial court abused its discretion in denying his request for appointment of an expert in eyewitness identification.  We review for an abuse of discretion a trial court's decision on a request for the appointment of an expert witness.  *People v Carnicom*, 272 Mich App 614, 616; 727 NW2d 399 (2006).  A trial court abuses its discretion when its decision falls outside the range of principled outcomes.  *Id*. at 617.

"[A] trial court is not compelled to provide funds for the appointment of an expert on demand."  *People v Tanner*, 469 Mich 437, 442; 671 NW2d 728 (2003).  Instead, under MCL 775.15, a trial court may appoint an expert witness for an indigent defendant, if the defendant demonstrates "that there is a material witness in his favor within the jurisdiction of the court, without whose testimony he cannot safely proceed to a trial[.]"  To obtain the appointment of an expert, the defendant "must demonstrate a nexus between the facts of the case and the need for an expert."  *Tanner*, 469 Mich at 443 (quotation marks and citation omitted).  "It is not enough for the defendant to show a mere possibility of assistance from the requested expert."  *Id*.  There must be some indication that expert testimony would likely benefit the defense.  *Id*.

Thomas argues that he could not safely proceed to trial without an expert because the eyewitness identification was the primary basis of his conviction and was particularly unreliable. He maintains that he needed an expert to explain how a variety of factors might have affected the victim's ability to accurately identify her assailant.  He states that the victim's identification was unreliable because of the stress she was under, the presence of a weapon, the cross-racial identification, her failure to describe Thomas' facial features before the preliminary examination, her pretrial exposure to his photo, her exposure to him at the preliminary examination after she viewed his photo without any procedural safeguards, and the circumstances during the offense that impaired her ability to perceive her assailant's features.  However, he presents no explanation as to why these issues could not be addressed using cross-examination, closing arguments, and jury instructions.

The record shows that Thomas' trial lawyer vigorously cross-examined the victim on her identification.  During cross-examination, Thomas' lawyer asked her about the lighting, her initial statement to the officers, and about her statement to the nurse examiner.  Thomas' lawyer questioned the victim about who, if anyone, the victim may have told about Thomas' brow structure, questioned her on the incident in the captain's office, and questioned her about inconsistencies between her trial and preliminary examination testimony.  Further, Thomas' lawyer cross-examined the first responding officer regarding the victim's initial description of her assailant.  He also questioned the lead detectives about how the viewing of Thomas' photograph in the captain's office could have compromised the identification.

During closing arguments, Thomas' lawyer challenged the victim's ability to identify her assailant given the evidence that the assailant was wearing a mask and it was dark.  He also noted her failure to describe Thomas' facial features to the officers on the night of the incident and that the only thing she was able to say about her assailant at that time was that he was black. He further highlighted inconsistencies in the victim's testimony and how her identification could

have been influenced by her exposure to his photograph after being told there was a DNA match. He pointed out that the lead detectives testified that the department did not show photographs without formal guarded procedures because it taints the procedure. He argued that the victim kept it a secret that she had seen the photograph at the station. He also argued that there was no group of black men in court when the victim identified Thomas at the preliminary examination. He suggested that the victim bolstered her testimony so that Thomas would be convicted. He argued that the victim evaded questions by looking to the judge to stop questions and arguing with him during cross-examination. Notably, the jury was also instructed on the proper considerations for evaluating eyewitness identification.

Although Thomas claims an expert was necessary to educate the jury about problems with eyewitness identification, in *People v Cooper*, 236 Mich App 643, 658; 601 NW2d 409 (1999), this Court noted "the obvious: memories and perceptions [of eyewitnesses] are sometimes inaccurate." As evidenced by the record, the problems with eyewitness identification in general and with the victim's identification in particular were repeatedly highlighted by Thomas' lawyer thorough impeachment of the victim's identification during the course of the trial.

On this record, the trial court did not abuse its discretion when it denied Thomas' request for an expert on eyewitness identification.

## IV. REBUTTAL OF ALIBI DEFENSE

In a brief submitted on his own behalf, Thomas argues that the trial court erred when it allowed the prosecutor to present evidence controverting his alibi defense despite the fact that the prosecutor did not provide him with the notice of intent to rebut that is required under MCL 768.20(2). This Court reviews de novo the proper interpretation and application of a statute. *People v Peltola*, 489 Mich 174, 178; 803 NW2d 140 (2011).

In October 2013, the prosecutor filed her second amended witness list. Like her first amended list, it included the following potential lay witnesses: Margaret Gonzalez, Melissa Morrissey, Beth Sheets, and Jeffrey Pergl. Later that same month, Thomas' lawyer filed a notice of alibi under MCL 768.20(1). It is undisputed that the prosecutor did not file a notice of intent to rebut the alibi. See MCL 768.20(2). Thomas argues that the trial court should have precluded the prosecutor from presenting witnesses and evidence contradicting his alibi under MCL 768.21(2). Specifically, he argues that Pergl's testimony that Thomas was not with Morrissey when she dropped her baby off with the babysitter should have been excluded because it directly contradicted his alibi. The question is whether a prosecutor can call in his or her case-in-chief witnesses who are expected to contradict a defendant's alibi without first filing a notice of intent to rebut the alibi.

The primary goal of judicial interpretation of statutes is to ascertain and give effect to the intent of the Legislature. *Peltola*, 489 Mich at 181. Nothing will be read into a clear statute "that is not within the manifest intent of the Legislature as derived from the words of the statute itself." *People v Breidenbach*, 489 Mich 1, 10; 798 NW2d 738 (2011) (quotation marks and citation omitted). "The first criterion in determining the Legislature's intent is the specific language of the statute." *People v Droog*, 282 Mich App 68, 70; 761 NW2d 822 (2009).

Under MCL 768.20(2), a prosecutor must provide a defendant a notice of the names of the witnesses that the prosecuting attorney proposes to call to controvert the defendant's alibi defense:

> Within 10 days after the receipt of the defendant's notice but not later than 5 days before the trial of the case, or at such other time as the court may direct, the prosecuting attorney shall file and serve upon the defendant a notice of rebuttal which shall contain, as particularly as is known to the prosecuting attorney, the names of the witnesses whom the prosecuting attorney proposes to call in rebuttal to controvert the defendant's defense at the trial of the case.

Thomas' arguments suggest that "rebuttal" should be broadly interpreted to mean any witness whose testimony will be inconsistent with his assertion of an alibi—regardless of whether he or she is called in the prosecutor's case-in-chief or is called in rebuttal after the defense rests. We do not believe that rebuttal should be given such an expansive construction. The notice provision plainly refers to witnesses that the prosecutor intends to call for the specific purpose of rebutting the defendant's alibi; it does not refer to the witnesses that the prosecutor intended to call in his or her case in chief to establish the elements of the crime, even though those witnesses' testimony will necessarily contradict the defendant's alibi. Indeed, Thomas' interpretation of the statute would lead to an absurd result. If the prosecutor were prohibited from calling any witnesses that would contradict Thomas' alibi, then the prosecutor would have been prohibited from calling the victim because she testified that Thomas was in her home sexually assaulting her at a time when he claimed he was elsewhere. We will not give the statute such an absurd construction. *People v Tennyson*, 487 Mich 730, 741; 790 NW2d 354 (2010).

We further note that the intent behind the rebuttal notice requirement in MCL 768.20 is to prevent surprise at trial. *People v Bell*, 169 Mich App 306, 308; 425 NW2d 537 (1988). In this case, the prosecutor's first and second amended witness lists—which were both filed before Thomas filed his notice of alibi—both indicated that Pergl would be called as a witness in the prosecutor's case-in-chief. Further, Thomas' trial lawyer represented to the court that, on the basis of the witness' statements, there was going to be testimony from a prosecution witness that the witness was with Thomas' alibi witness. Thus, Thomas' trial lawyer was plainly aware that the witness might testify in a way that controverted Thomas' alibi witness. This is not a case where the trial process was relegated to a "poker game in which players enjoy an absolute right always to conceal their cards until played." *People v Travis*, 443 Mich 668, 679; 505 NW2d 563 (1993) (quotation marks and citation omitted). Thomas' trial lawyer had actual notice that the witness at issue might undermine Thomas' alibi defense.

Finally, in determining whether a trial court abused its discretion in allowing the testimony of a rebuttal witness when notice under MCL 768.20 was untimely, we consider: "(1) the amount of prejudice that resulted from the failure to disclose, (2) the reason for nondisclosure, (3) the extent to which the harm caused by nondisclosure was mitigated by subsequent events, (4) the weight of the properly admitted evidence supporting the defendant's guilt, and (5) other relevant factors arising out of the circumstances of the case." *Id*. at 682 (quotation marks and citation omitted). Thomas was aware of the names of the witnesses, the prosecutor's intent to present them in her case-in-chief, and the substance of their testimony. The record also shows that the prosecutor did not give the notice because she did not intend to

specifically rebut Thomas' alibi defense, but only intended to present her case-in-chief using the previously disclosed witnesses. Because Thomas knew who the prosecutor intended to call and had access to the clearly contradictory statements already provided by those witnesses, there was little—if any—harm occasioned by the failure to provide additional notice. In other words, knowing that the prosecutor intended to call Pergl and knowing what Pergl was likely to say should have been sufficient for Thomas' trial lawyer to evaluate whether he wanted to proceed with an alibi defense in light of the evidence.

Finally, even if there were error, it would not warrant relief. The key element was identification and there was overwhelming evidence identifying Thomas as the victim's assailant. The victim identified Thomas as her attacker, cell phone records put him in the area at the time of the assault, and DNA from the assailant's do-rag implicated Thomas. Finally, Thomas' own alibi witness was significantly impeached by her own prior inconsistent statement and by Thomas' initial statement to officers in which he failed to disclose alibi witnesses even though he was asked if anyone could attest to his whereabouts on the day of the assault. Accordingly, even if there were error, it was harmless.

## V. OPINION EVIDENCE

Thomas next argues that the trial court erred when it allowed Megan Johnston, a crime analyst with the Lansing Police Department who was not qualified as an expert under MRE 702, to provide improper opinion testimony. "The decision whether to admit evidence is within the discretion of the trial court and will not be disturbed on appeal absent a clear abuse of discretion." *People v Aldrich*, 246 Mich App 101, 113; 631 NW2d 67 (2001).

Lay opinion testimony is generally admissible when the opinions or inferences are "(a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact and issue." MRE 701. Courts have liberally applied MRE 701 in order to help develop a clearer understanding of facts for the trier of fact. *People v Oliver*, 170 Mich App 38, 50; 427 NW2d 898 (1988), mod on other grounds 433 Mich 862 (1989). Thus, a lay witness may offer an opinion on matters that are related to her observations, which are not overly dependent upon scientific, technical, or other specialized knowledge. See *id*.

Here, Johnston testified that she constructed maps using data drawn from the records for the cell phone Thomas was using. She indicated that all of the information on the maps was taken from phone records generated by Sprint. During cross-examination, she admitted that she was unfamiliar with how Sprint set up their system. Although Thomas suggests that Johnston testified that his cell phone was in a particular location, Johnston did not actually state that Thomas was located in a particular place. Instead, the challenged testimony regarding the maps was based on Johnston's perceptions of the phone records that were properly admitted through the custodian of records at Sprint. The testimony was relevant and helpful to the jury in determining the exact locations of the towers communicating with Thomas' cell phone. MRE 401. Her testimony also did not require overly technical or scientific knowledge. And, even if it were error to allow the testimony, any error was harmless. *People v Lukity*, 460 Mich 484, 495-496; 596 NW2d 607 (1999).

## VI. PERJURED TESTIMONY

Finally, Thomas argues that his conviction was obtained through the prosecutor's knowing use of perjured testimony. This issue is unpreserved because Thomas's trial lawyer did not object and request a curative instruction. See *People v Bennett*, 290 Mich App 465, 475; 802 NW2d 627 (2010). This Court reviews unpreserved claims of prosecutorial error for plain error affecting the defendant's substantial rights. *People v Thomas*, 260 Mich App 450, 454; 678 NW2d 631 (2004). Moreover, this Court "cannot find error requiring reversal where a curative instruction could have alleviated any prejudicial effect." *Bennett*, 290 Mich App at 476.

A defendant's right to due process "is violated when there is any reasonable likelihood that a conviction was obtained by the knowing use of perjured testimony." *People v Gratsch*, 299 Mich App 604, 619; 831 NW2d 462 (2013), vacated in part on other grounds 495 Mich 876 (2013). Thus, a prosecutor has "an obligation to correct perjured testimony that relates to the facts of the case or a witness's credibility." *Id*. However, reversal is not necessary when the prosecutor does not attempt to conceal contradictions in a witness's testimony and defense counsel is afforded a sufficient opportunity to impeach the witness's credibility with his or her prior statements. *People v Parker*, 230 Mich App 677, 690; 584 NW2d 753 (1998).

Thomas highlights an instance where the victim's testimony about the circumstances surrounding her identification at trial differed from her testimony at the preliminary examination. Specifically, during the preliminary examination, she agreed that it was "the first time seeing in person or on paper, other than the newspaper, anyone even accused of this crime." At trial, she testified that she had seen Thomas' photo in the news and at the police station.

We conclude that the inconsistency identified by Thomas does not establish that the prosecutor knowingly used perjured testimony. Although the victim's testimony regarding certain details appears to differ from her prior testimony, there is no indication that the prosecutor sought to conceal these inconsistencies. In fact, the victim's testimony clearly indicated that she believed her earlier testimony was still accurate. Thus, ultimately, Thomas' argument does not involve an issue of perjury but rather, it concerns credibility. His lawyer fully explored the alleged inconsistency during cross-examination of the victim. The jury was free to believe or disbelieve all or any portion of her trial testimony. *People v Wolfe*, 440 Mich 508, 514-515; 489 NW2d 748 (1992). Further, there is no indication that the prosecutor attempted to conceal the alleged inconsistency in the victim's testimony, and it is clear that Thomas' trial lawyer had "ample opportunity" to impeach the witness. *Parker*, 230 Mich App at 690. Thus, Thomas has not established that the prosecutor violated his due process rights by offering, and failing to correct, perjured testimony at trial.

Thomas has not established any error warranting a new trial or other relief.

Affirmed.

/s/ Michael F. Gadola
/s/ Joel P. Hoekstra
/s/ Michael J. Kelly