*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

LARRY JAMES BAILEY,

        Defendant-Appellant.

UNPUBLISHED
April 28, 2022

No. 338351
Macomb Circuit Court
LC No. 2016-002492-FH

AFTER REMAND

Before: SHAPIRO, P.J., and GADOLA and REDFORD, JJ.

PER CURIAM.

Following a second remand by this Court to develop the record regarding defendant's claim that his trial counsel provided him ineffective assistance of counsel, the trial court conducted a three-day evidentiary hearing[1] at the conclusion of which the trial court denied defendant's motion for a new trial. Defendant appeals that decision. For the reasons stated in this opinion, we affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Defendant appealed his convictions by a jury of assault with intent to commit criminal sexual conduct involving penetration, MCL 750.520g(1), and second-degree criminal sexual conduct against a minor child under 13 years of age, MCL 750.520c(1)(a) and (2)(b), on the ground that his trial counsel provided him ineffective assistance by introducing a transcript of the child's forensic interview into evidence and also by failing to investigate and call two witnesses in his defense. This Court retained jurisdiction and remanded this case for an evidentiary hearing because the record lacked clarity regarding whether defense counsel's "decisions constituted

---

[1] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

-1-

reasonable professional judgment given the facts of the case and counsel's strategy and options."[2] On remand, the trial court held an evidentiary hearing after which it ruled that defendant had not been denied his constitutional right to effective assistance of counsel and denied defendant's motion for a new trial. This Court affirmed the trial court's ruling.[3] In its opinion, this Court stated:

> At the hearing, defense counsel testified that his strategy was to undermine the complainant's testimony by showing deficiencies in the forensic interview. Specifically, the interview was not video recorded but instead transcribed by staff members who were not licensed stenographers. Moreover, the questions and answers were written down by two different individuals and there are points in the transcripts where it is not clear what question goes with what answer. Counsel also noted that there were several times when the complainant's response was recorded as "not audible." Counsel asserted that these deficiencies showed that CARE House and the prosecutor were merely "rubber stamping" the charges against defendant. The trial court found that defendant's claim failed on both counts, i.e., counsel provided effective assistance of counsel and that there was not a reasonable probability that defendant was prejudiced by counsel's performance, noting that the complainant's testimony was "more than credible."

> Counsel had few options in terms of strategy given the strength of the prosecution's proofs. However, given that the content of the transcript was highly inculpatory, whether defense counsel's claimed strategy was an objectively reasonable strategy is a close question. See *People v Ackley*, 497 Mich 381, 388-389; 870 NW2d 858 (2015). In the interview, the complainant recounted two specific instances of abuse consistent with her testimony at trial and named defendant as her abuser. Moreover, counsel's questions and arguments regarding the recording of the interview could have been made without introduction of the transcript into evidence. Finally, contrary to counsel's testimony, the transcript is not particularly difficult to follow, nor does it contain indications that the complainant's answers were the result of coaching or improper leading questions. Although there were a few instances where the complainant's response was recorded as inaudible, concluding that these answers were potentially exculpatory was little more than speculation.

---

[2] *People v Bailey*, unpublished per curiam opinion of the Court of Appeals issued March 7, 2019 (Docket No. 338351). We incorporate by reference the factual background set forth in this Court's previous opinion.

[3] *People v Bailey (After Remand)*, unpublished per curiam opinion of the Court of Appeals issued June 27, 2019 (Docket No. 338351).

However, we need not definitively decide whether counsel's performance was objectively unreasonable because we agree with the trial court that defendant has not shown outcome-determinative prejudice.[4]

Defendant filed an application for leave to appeal this Court's June 27, 2019 judgment to our Supreme Court which, in lieu of granting leave to appeal, remanded the case to this Court for consideration whether defendant's trial counsel provided ineffective assistance by failing to investigate and present witnesses at trial to support his theory of defense.[5]

Following remand from our Supreme Court, this Court ordered the case remanded to the trial court for an evidentiary hearing and decision whether defendant had been denied the effective assistance of counsel because he failed to call defendant's wife, Lakeisha Bailey, and his friend, Maurice Hamilton, as witnesses.[6] In its opinion, this Court explained that, in support of his claim that his trial counsel provided ineffective assistance by failing to investigate and call the two witnesses defendant

> submitted an affidavit stating that he told trial counsel of two witnesses, Maurice Hamilton and Lakeisha Bailey (defendant's wife), who would have testified that Sierra made threats against defendant if he "were to ever leave her." Defendant's appellate counsel also submitted an affidavit summarizing her telephone conversations with Hamilton and Lakeisha. According to appellate counsel, Hamilton indicated that he was present on more than one occasion when Sierra made threats against defendant, stating that "she would 'fix him' or that she would 'get him locked up' if he ever left her." Hamilton told appellate counsel that he was not contacted by trial counsel. Appellate counsel averred that Lakeisha would have testified that Sierra stated shortly before her and defendant's final breakup that she would "see [defendant] in prison" before seeing him reunite with Lakeisha.
>
> * * *
>
> [T]here was brief testimony from trial counsel regarding his decision not to call Hamilton or Lakeisha as witnesses. Trial counsel testified that he was unable to contact Hamilton:
>
>> [W]hat I recall was there was an attempt to try to reach out to him, numerous family members and friends were trying to assist me in that regard and information that I did ultimately receive, I think I did attempt to reach out to him on a number I was provided, but the family and friends weren't able to make contact with him.

---

[4] *Id*. at 2.

[5] *People v Bailey*, 505 Mich 964; 937 NW2d 362 (2020).

[6] *People v Bailey*, unpublished order of the Court of Appeals entered April 6, 2020 (Docket No. 338351).

He also explained that "based on the information that I was provided that he would testify to, it would not be material and it would have been hearsay." Trial counsel testified that he spoke to Lakeisha "on numerous occasions," but that it was difficult to keep in contact with her because she did not have a working phone and was in the process of being evicted from her home. Trial counsel later agreed with the prosecutor that he did not call the witnesses because he could not "get a hold of" them.

In concluding that defendant was not denied effective assistance of counsel, the trial court did not address trial counsel's decision not to call Hamilton or Lakeisha as witnesses. Nor did we when the case was submitted to us after remand.[7]

This Court ruled that, to decide the matter, the factual record needed further development and directed the trial court to conduct an evidentiary hearing and ordered it to determine:

whether defense counsel's decision not to call these two witnesses constituted ineffective assistance of counsel. If the trial court concludes that it was, it shall then consider whether their testimony would have made a different result reasonably probable, and further whether the failure to call these witnesses along with counsel's admission of the CARE House interview transcript constituted cumulative prejudice so as to have made a different result reasonably probable.[8]

On remand, the trial court held an evidentiary hearing at which it again heard testimony from defendant's trial counsel, Ronnie Cromer, and also Lakeisha Bailey and Hamilton. Cromer testified that, as part of the defense strategy, defendant intended to cast doubt on the credibility of the victim, LJ, eight years old at the time of trial, and her mother, Sierra Johnson, by establishing that LJ fabricated her accusations against defendant at the behest of her mother who manipulated the child to lie to law enforcement. Defendant had asked Cromer to call Lakeisha and Hamilton. Cromer testified that he spoke with Lakeisha numerous times by telephone and also met with her personally a couple times. He did not believe that he ever saw her in the courthouse. He thought that she did not come to court because he could not locate her right before trial. Cromer stated that he intended to call her as a witness but at the time of trial she faced eviction from her home, had been struggling financially, and had her cell phone turned off, all of which prevented him from contacting her. He did not believe that Lakeisha ever visited defendant while in jail and he asserted that she never appeared in court. Cromer testified that he believed that the majority of her testimony would have been admissible.

Regarding Hamilton, Cromer testified that he sought to contact him but never had an address or phone number for him. Defendant's friends and family assisted him in trying to make contact but he never had success in doing so. Cromer lacked certainty whether Hamilton's

[7] *People v Bailey (On Remand)*, unpublished per curiam opinion of the Court of Appeals issued April 6, 2020 (Docket No. 338351), at 2-3.

[8] *Id*. at 4.

testimony would have been admissible because it might merely be hearsay. He conceded that he never confirmed anything regarding Hamilton's potential testimony.

Lakeisha testified that she married defendant in 2014. She knew Sierra who had been defendant's girlfriend before the marriage. She affirmed that, during Lakeisha and defendant's marriage in 2015, defendant continued his relationship with Sierra. Lakeisha affirmed that she knew Cromer and had spoken with him by telephone and in person before defendant's trial about her potential testimony. She stated that, although she could have communicated with Cromer via Facebook messenger, neither she nor he did so. Lakeisha testified that she attended every court proceeding including defendant's trial, except that she left the court before the jury returned its verdict, after which Cromer called her and told her the verdict.

Lakeisha testified that Sierra "said that she would see [defendant] back in prison before she see him back with me." Lakeisha explained that she spoke via telephone with Sierra and communicated by text messaging and Facebook messenger from January 2015 until the beginning of 2016. Lakeisha described the content of March 21, 2015 Facebook messenger communications that she had with Sierra in which Sierra indicated that she loved defendant and stated, "I will bust every window out of the house and another man pay for." Lakeisha testified that that message was one of many conversations she had with Sierra during 2015. She stated further that Sierra told her around the end of 2015 that she would rather see defendant in jail than with Lakeisha. She affirmed that she thought Sierra had been behind the allegations made by the victim.

During cross-examination, Lakeisha testified that she heard the trial court instruct persons who were going to testify to leave the courtroom but explained that she did not leave because Cromer had not asked her to testify and had told her that he did not need her testimony. She also testified that she never visited defendant while in jail. On further direct examination, Lakeisha testified that she had not been subpoenaed to testify at defendant's trial. She also stated that she visited defendant in the county jail by video. At the conclusion of Lakeisha's testimony, the trial court adjourned the hearing because of Hamilton's unavailability.

When the trial court resumed the evidentiary hearing about a month later, Hamilton testified that he knew defendant for over 15 years and also knew Sierra for around 5 years. He characterized defendant and Sierra's relationship during 2015 as romantic and stated that he knew that they shared an apartment despite defendant's marriage to Lakeisha. He denied that he spent time socially with defendant and Sierra and stated that he had been present when they conversed once or twice. Hamilton affirmed that he heard Sierra tell defendant that if he left her, she would have him locked up but conceded that he did not know what precipitated the statement or what she had in mind.

On cross-examination, Hamilton admitted that he could not recall when Sierra made the statement but remembered that it had been outside a building during the summer. Hamilton testified that he did not know what went on between defendant and Sierra that prompted her to make the statement regarding having defendant locked up. Hamilton explained that Sierra had not made the statement in anger but seriously in a normal street talking mode. Hamilton affirmed that Cromer never contacted him and stated that during defendant's trial he had been out of town. He testified that no one contacted him. On further direct examination, Hamilton stated that he would have appeared at defendant's trial if subpoenaed. Hamilton also explained that, during 2015

through the 2017 trial, he had worked as a truck driver off and on and at a factory. He could not recall specific dates of his various jobs. At the conclusion of his testimony, the trial court adjourned the proceedings to permit the parties to submit supplemental briefs.

The trial court reconvened the evidentiary hearing about a month later and permitted the parties to present their positions regarding whether defendant had been denied effective assistance of counsel during his trial. Defendant argued that, because Cromer performed deficiently to his prejudice by neglecting to fulfill his promise in his opening statement that the jury would hear testimony linking Sierra to LJ's allegations, he should be granted a new trial. Defendant asserted that Cromer failed to investigate Hamilton's testimony and despite knowing Lakeisha's potential testimony he failed to call her as a witness even though she attended the trial and would have testified. Defendant also argued that Cromer failed to effectively cross-examine Sierra regarding her out-of-court statements. Defendant contended that Hamilton's testimony regarding Sierra's statement could be admitted under MRE 803(3) as the declarant's statement of her present state of mind, and that the same logic applied to Lakeisha's testimony regarding Sierra's threat, such that the jury should have heard their testimonies and been able to make the link between defendant's leaving Sierra on December 15, 2015, and LJ's allegations that came out five days later, which made it more likely that Sierra acted on her threat by putting LJ's accusations in motion.

The trial court stated that, even assuming that Cromer had performed deficiently by not calling Lakeisha and Hamilton as witnesses, after having heard their respective testimonies, the court questioned how either had evidence relevant to the matter at bar because both merely testified that Sierra made statements at some time in the past. The trial court observed that Lakeisha testified regarding two women who shared the same man's affections and both expressed their desires to preserve their own romantic interest. The trial court stated that Lakeisha's testimony that Sierra said that she would have defendant put in jail did not indicate when Sierra made the statement. The trial court also noted that Hamilton heard an out-of-court statement with no explanation of the context that did not seem to indicate a threat.

Defendant asserted that just before LJ disclosed to her grandmother her accusation while on the phone, she had previously been speaking with Sierra. Defendant argued that the jury should have been able to consider the testimonies and if they had, a reasonable probability existed that the outcome of defendant's trial would have been different. Defendant conceded that his defense was not ironclad; but given what Sierra had stated and the timing of LJ's disclosure, the testimony would cast doubt on Sierra's version of events, and in turn, the jury would have been able to make the link with LJ's disclosure. Defendant contended that Cromer's failure to call the witnesses along with his defective performance respecting admission of the CARE House interview constituted cumulative error that prejudiced defendant and made a different trial result reasonably probable. Defendant asserted that the jury had been left with no exculpatory testimony as promised by Cromer.

The prosecution stated that Cromer testified that he unsuccessfully tried to contact Hamilton who in turn testified that he had not been contacted and had been out of town during defendant's trial. The prosecution argued that Cromer's conduct in that regard did not constitute defective performance. Regarding Lakeisha, the prosecution questioned her credibility and pointed out that the county jail records indicated that defendant had no video visits whatsoever during 2016 contrary to Lakeisha's testimony. The prosecution also explained that, although

Lakeisha testified that she attended the trial, the trial transcript indicated that defense counsel asked for a sequestration order to remove the audience from the courtroom because he did not know the people in attendance. The prosecution stated that Cromer knew Lakeisha because he had in-person contact with her, intimating that if he saw her in the audience as she claimed to be, he would not have made the statement. Further, the prosecution pointed out that Cromer testified that Lakeisha had not attended the trial and that he had not been able to contact her because her phone had been shut off, which Hamilton corroborated in his testimony.

The prosecution also argued that, even assuming that Cromer had performed deficiently as alleged by defendant, defendant could not establish prejudice. The prosecution asserted that Hamilton's testimony merely indicated a vague statement made by Sierra that she would have defendant locked up, without any knowledge of the context or meaning of the statement, and his testimony constituted inadmissible hearsay. The prosecution argued that Hamilton's recitation of Sierra's statement could not be admissible under MRE 803(3) as an expression of her present state of mind because Hamilton lacked the ability to place the statement into any context that revealed the statement as one regarding Sierra's present state of mind.

Respecting Lakeisha's testimony, the prosecution asserted that the Facebook messages lacked admissibility even for impeachment purposes because it constituted extrinsic evidence. Further, the prosecution contended that the Facebook messages were made a year before the charges were brought against defendant, and the messages themselves did not show any bias toward defendant but demonstrated merely an argument between two women. Regarding Lakeisha's testimony that Sierra said to her that she would have defendant locked up if he ever left her, that statement had been made in the fall of 2015 months before LJ's accusations, and then later the women's last conversation on Facebook indicated that Lakeisha and Sierra had a good relationship. The prosecution argued that the statements could not serve to impeach Sierra's credibility at trial and did not establish that, had Lakeisha testified, a reasonable probability existed that defendant's trial would have resulted differently. The prosecution also asserted that Lakiesha's testimony did nothing to impeach the credibility of LJ's or her grandmother's testimonies which were credible. The prosecution contended that, even if the defense had been able to present the evidence to impeach Sierra, a collateral witness, defendant did not and could not cast doubt on LJ's testimony.

Respecting defendant's argument that Cromer's cumulative error prejudiced defendant, the prosecution argued that all of the alleged errors taken together did not prejudice the outcome of defendant's trial because Hamilton's and Lakeisha's testimonies merely attacked the credibility of a collateral witness regarding a collateral matter and did nothing to impeach the credibility of the victim or her grandmother who provided credible testimonies. In rebuttal, defendant argued that Cromer promised the jury testimony that linked Sierra to LJ that could have revealed Sierra putting her daughter up to making the allegations, but Cromer instead did nothing.

The trial court issued its opinion and ruling from the bench. The trial court reflected upon the trial testimony that eight-year-old LJ gave and opined that the consistency of her testimony undermined defendant's defense that LJ had been manipulated by Sierra just before disclosing the sexual abuse to her grandmother. The trial court found that defendant's theoretical communication between Sierra and LJ, without any substantive evidence to support it, could not undermine LJ's credibility nor indicate that LJ had been deceptive regarding to whom she disclosed. The trial

court stated that, considering LJ's testimony, defendant failed to persuade the court that a reasonable probability of a different result existed. The trial court agreed with defendant that defendant's trial counsel had not done enough to locate the witnesses, but the court questioned whether Hamilton's testimony would have benefited defendant. The trial court found that Lakeisha's testimony provided insight into the relationship between Lakeisha, Sierra, and defendant, but it would not have provided insight into the credibility of LJ. The trial court found that LJ's testimony's consistency and detail would not have been undermined or challenged by the witnesses' testimonies sufficiently to establish the existence of a reasonable probability that defendant's trial would have resulted in a different outcome.

The trial court also considered whether defendant suffered prejudice because of cumulative deficient performance by his trial counsel. The trial court opined that trial counsel performed deficiently respecting the CARE House interview transcript by introducing it into evidence but concluded that such performance did not influence the trial outcome. The trial court found that the limited benefit of Hamilton's and Lakeisha's testimonies, because they did not relate to or challenge the credibility of LJ, the victim, even when coupled with trial counsel's deficient performance regarding the CARE House interview transcript, did not result in cumulative prejudice that established a reasonable probability that a different trial outcome would have resulted. The trial court, therefore, denied defendant's motion for a new trial.

## II. STANDARD OF REVIEW

A claim of ineffective assistance of counsel "presents a mixed question of fact and constitutional law." *People v Armstrong*, 490 Mich 281, 289; 806 NW2d 676 (2011). We review the trial court's findings of fact, if any, for clear error, and review de novo its conclusions of law. *People v Petri*, 279 Mich App 407, 410; 760 NW2d 882 (2008). Regard should be given to the trial court's opportunity to assess the credibility of the witnesses who appeared before it. MCR 2.613(C); see also *People v Dendel*, 481 Mich 114, 130; 748 NW2d 859 (2008), amended 481 Mich 1201 (2008). "Clear error exists if the reviewing court is left with a definite and firm conviction that the trial court made a mistake." *Armstrong*, 490 Mich at 289. A claim of ineffective assistance of counsel "premised on the failure to call witnesses is analyzed under the same standard as all other claims of ineffective assistance of counsel." *People v Jurewicz*, 506 Mich 914; 506 NW2d 448 (2020). "[W]hether evidence is admissible under a particular rule of evidence is a question of law that this Court reviews de novo." *People v McDaniel*, 469 Mich 409, 412; 670 NW2d 659 (2003).

## III. ANALYSIS

Defendant first argues that his trial counsel performed deficiently by knowing that two witnesses, Lakeisha and Hamilton, could provide exculpatory testimony on defendant's behalf, and by promising the jury that they would hear exculpatory testimony, but failed to investigate and contact Hamilton, and despite meeting with Lakeisha and discussing matters with her, failed to call either of them as witnesses to defendant's prejudice. Defendant contends that, had his trial counsel called the two witnesses, a reasonable probability exists that his trial would have resulted differently, and consequently, the trial court erred by denying defendant a new trial. We disagree.

Under Michigan law, effective assistance of counsel is presumed, and defendant bears a heavy burden of proving otherwise. *People v Solmonson*, 261 Mich App 657, 663; 683 NW2d 761 (2004). Defense counsel's performance must be measured against an objective standard of reasonableness. *People v Rockey*, 237 Mich App 74, 76; 601 NW2d 887 (1999). "This Court does not second-guess counsel on matters of trial strategy, nor does it assess counsel's competence with the benefit of hindsight." *People v Russell*, 297 Mich App 707, 716; 825 NW2d 623 (2012). "A trial strategy is not ineffective simply because it ultimately does not succeed. A strategy is also not ineffective because it entails taking calculated risks, especially if the range of available options for the defense is meager." *People v White*, 331 Mich App 144, 149; 951 NW2d 106 (2020) (citation omitted). Further, defendant "has the burden of establishing the factual predicate for his claim of ineffective assistance of counsel." *People v Hoag*, 460 Mich 1, 6; 594 NW2d 57 (1999). "[D]ecisions regarding what evidence to present and whether to call or question witnesses are presumed to be matters of trial strategy[.]" *People v Dixon*, 263 Mich App 393, 398; 688 NW2d 308 (2004) (quotation marks, citation, and brackets omitted).

Defendant bears the burden of establishing that defense counsel provided ineffective assistance by showing that "(1) counsel's performance fell below an objective standard of reasonableness and (2) but for counsel's deficient performance, there is a reasonable probability that the outcome would have been different." *People v Trakhtenberg*, 493 Mich 38, 51; 826 NW2d 136 (2012). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *People v Carbin*, 463 Mich 590, 600; 623 NW2d 884 (2001) (quotation marks and citations omitted).

Defense counsel "has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland v Washington*, 466 US 668, 691; 104 S Ct 2052; 80 L Ed 2d 674 (1984). "The failure to make an adequate investigation is ineffective assistance of counsel if it undermines confidence in the trial's outcome." *People v Grant*, 470 Mich 477, 493; 684 NW2d 686 (2004).

We first consider defendant's argument that his trial counsel failed to make reasonable investigation regarding Hamilton. The evidentiary record relating to this issue, which was developed in the trial court after we remanded for an evidentiary hearing, indicates that Cromer sought to contact Hamilton but lacked the means to do so. Despite his efforts, he obtained no address or telephone number for him and defendant's family and friends apparently also were unable to put him in contact with Hamilton. Hamilton testified that he worked intermittently as a truck driver and at a factory and had a permanent address. The record does not fully explain the things Cromer did to contact Hamilton, but defendant has presented no evidence of specific, verifiable deficiency in his efforts. We cannot conclude that Cromer's performance in this regard fell below an objectively reasonable standard. Further, Hamilton testified unequivocally that, at the time of defendant's trial, he was out of town. Cromer's unsuccessful efforts to contact Hamilton do not require us to conclude that he failed to make reasonable investigation regarding Hamilton. He knew of Hamilton's potential testimony but had no means of contacting him and others had not provided him with contact information sufficient to pursue Hamilton. Accordingly, we are not persuaded that defendant has met his burden in establishing the first prong of the ineffective assistance test.

Even assuming that Cromer performed deficiently in this regard, we also must determine whether Hamilton's testimony would have been admissible; and if so, whether Cromer's failure to procure him as a witness and present that evidence permits the conclusion that a reasonable probability exists that the outcome would have been different. At the evidentiary hearing, Hamilton testified that, at an unknown time, perhaps around the end of summer, outside of a building, and without any contextual background information to give meaning to her statement, Hamilton overheard Sierra in a normal voice make a remark to defendant. Hamilton testified at the evidentiary hearing as follows:

> *Q*. But would you see each other socially, either part—did you ever see them socially in 2015, 2016?
>
> *A*. I can't recall, can't recall.
>
> *Q*. Okay. Were you present at any time for conversation between Larry and Cierra?
>
> *A*. Yes, one time, once or twice.
>
> *Q*. And during those conversations did you ever hear Cierra threaten Larry?
>
> *A*. As in?
>
> *Q*. Well, did Cierra ever make threats to Larry about what Cierra would do if Larry left for Lakisha?
>
> *A*. I recall one time a statement being made that if he—if she have him locked up. Now I don't know if he did left [sic] or not but I know it was a thing locked up, you know what I'm saying. I don't understand what it was behind, what it was for at the moment, but I heard it once before.
>
> *Q*. So at the time that you heard Cierra say, "I'll have you locked up," you didn't know what she had in mind, is that fair to say?
>
> *A*. No. Right. Fair.[9]

At the evidentiary hearing, Cromer conceded that Hamilton's potential testimony likely constituted hearsay. " 'Hearsay' is a statement, other than the one made by the declarant while testifying at the trial or hearing offered in evidence to prove the truth of the matter asserted." MRE 801(c). "Hearsay is not admissible except as provided by these rules." MRE 802.

Hamilton's testimony appears to fall squarely into the definition of hearsay and would not be admissible unless an exception under MRE 803 applies. Hamilton testified regarding an out-

---

[9] Transcripts of proceedings in this case spell Sierra in some instances as "Cierra," and Lakeisha as "Lakisha." In this opinion, we have utilized the spelling of names as stated in this Court's previous opinions.

of-court statement made by Sierra that defendant sought to admit to prove the truth of the matter asserted. Defendant argues that Hamilton's testimony would be admissible under MRE 803(3) which provides an exception to the exclusion of hearsay evidence for statements concerning a declarant's then existing mental, emotional, or physical condition. Under MRE 803(3), "A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health)" is not excluded by MRE 802's hearsay prohibition. In *People v Moorer*, 262 Mich App 64, 68-69; 683 NW2d 736 (2004), this Court explained:

> Statements of mental, emotional, and physical condition, offered to prove the truth of the statements, have generally been recognized as an exception to the hearsay rule because special reliability is provided by the spontaneous quality of the declarations when the declaration describes a condition presently existing at the time of the statement. 2 McCormick, Evidence (5th ed), Spontaneous Statements, § 273, p 214. "[T]he special assurance of reliability for statements of present state of mind rests upon their spontaneity and resulting probable sincerity." *Id*. at § 274, p. 217. When such declarations include assertions other than state of mind, such as events leading to the state of mind, additional considerations must be addressed in deciding whether the statements are admissible:

>> For example, a victim may assert that the defendant's acts caused the state of mind. The truth of those assertions may coincide with other issues in the case, as where the defendant is charged with acts similar to those described. In such circumstances, the normal practice is to admit the statement and direct the jury to consider it only as proof of the state of mind and to disregard it as evidence of the other issues. Compliance with this instruction is probably beyond the jury's ability and almost certainly beyond their willingness. Where substantial evidence has been admitted on the other act, probably little harm results. However, where the mental state is provable by other available evidence and the danger of harm from improper use by the jury of the offered declarations is substantial, the trial judge should exclude the statements or prohibit the witness from giving the reasons for the state of mind. [*Id*. at § 274, pp. 220-221.]

In *People v Fisher*, 449 Mich 441, 449-451; 537 NW2d 577 (1995), our Supreme Court explained:

> It is well accepted that evidence that demonstrates an individual's state of mind will not be precluded by the hearsay rule. Several legal scholars have commented on the nonhearsay use of such evidence:

>> Wherever an utterance is offered [into] evidence [for] the *state of mind* which ensued *in another person* in consequence of the utterance, it is obvious that no assertive or testimonial use is sought to be made of it, and the utterance is therefore admissible, so far as

-11-

the hearsay rule is concerned. [6 Wigmore, Evidence (Chadbourn rev), § 1789, p 314 (emphasis added).]

Likewise, in 4 Weinstein, Evidence, ¶ 801(c)[01], pp 801-94 to 801-96:

> An utterance or a writing may be admitted to show the effect on the hearer or reader when this effect is relevant. The policies underlying the hearsay rule do not apply because the utterance is not being offered to prove the truth or falsity of the matter asserted.

Specifically, statements by murder victims regarding their plans and feelings, have been admitted as hearsay exceptions in a number of jurisdictions. In *United States v Donley*, 878 F2d 735, 737-739 (CA 3, 1989), cert den 494 US 1058, 110 S Ct 1528, 108 L Ed 2d 767 (1990), a statement by the victim's wife that she intended to move out of the apartment and separate from the defendant-husband was found admissible to show marital discord and motive. Likewise, in *Whitmire v State*, 789 SW2d 366 (Tex App1990), statements of the decedent-husband that he wanted to end the marriage with the defendant-wife were found admissible. See also *United States v Hartmann*, 958 F2d 774, 782 (CA 7, 1992), in which statements made by the victim-husband about the "dismal state of his marriage" to the defendant-wife, his removal of her as beneficiary from his life insurance policy, and statements of his fear of being killed by the defendant-wife and her codefendant lover all were found admissible under a state of mind exception to the hearsay rule.

In the case at hand, marital discord, motive, and premeditation are all at issue. Thus, the statements of the victim-wife are admissible to show the effect they had on the defendant-husband. This testimony will not offend the hearsay rule because it does not constitute hearsay.

The victim-wife's statements that were not known to the defendant about her plans to visit Germany to be with her lover and her plans to divorce the defendant upon her return are hearsay. They are admissible, however, because they satisfy the exception to the hearsay rule for "statement[s] of the declarant's then existing . . . intent, plan . . . [or] . . . mental feeling. . . ." MRE 803(3). The victim, five days before her fatal assault, wrote in her journal:

> The way I'm feeling right now is that I want to go [to Germany]. . . . I am afraid if I allow myself to let my defenses down with Charles [the defendant] he will manipulate me into forgetting about the importance of my career, traveling, having children I will resent in the future. He manipulated me into marriage, . . . now by telling my father about my plan to go to Europe. I am sick of this manipulation of me. I want to get away from it.

In *Fisher*, our Supreme Court concluded that evidence of several statements made by a murder victim were admissible even though the victim's state of mind was not "at issue," because they demonstrated marital discord, motive, and premeditation. *Id*. at 447-450.

In *Moorer*, 262 Mich App at 71, this Court analyzed *Fisher* and explained:

> On the basis of the specific holdings in the cases cited, the *Fisher* Court held that the victim-wife's statements, known to the defendant, were admissible to show the effect they had on the defendant-husband, i.e., the listener's state of mind:
>
> > In the case at hand, marital discord, motive, and premeditation are all at issue. Thus, the statements of the victim-wife are admissible to show the effect they had on the defendant-husband. This testimony will not offend the hearsay rule because it does not constitute hearsay. [*People v Fisher*, 449 Mich 441, 450; 537 NW2d 577 (1995).]
>
> The Court further held that the victim-wife's statements that were not known to the defendant, concerning her future plans, although hearsay, were admissible under MRE 803(3).

In *Moorer*, this Court considered whether the trial court properly admitted under MRE 803(3) witnesses' testimonies regarding statements that the murder victim made to several people before his death, including that he had a confrontation with the defendant, that the defendant wanted to kill him, that the defendant had threatened to kill him, that the defendant said he had a bullet for him, and that the defendant was looking for him with a gun. The defendant argued that such out-of-court statements were not admissible under MRE 803(3). This Court agreed and explained:

> These statements relate to past events and are specifically excluded under MRE 803(3) as statements of "memory or belief to prove the fact remembered or believed. . . ." They therefore do not fall within the parameters of MRE 803(3). See *People v Hackney*, 183 Mich App 516, 527 n 2; 455 NW2d 358 (1990) (a statement explaining a past sequence of events, from the standpoint of the declarant at the time of the statement, is a "statement of memory or belief" that is explicitly excluded from the exception). We agree with defendant that *Fisher* is not proper authority for the admission of the challenged statements. The statements in *Fisher* described the intentions and plans of the declarant, not the past or presumed future actions of the defendant. [*Moorer*, 262 Mich App at 73.]

In the case at bar, Hamilton testified vaguely regarding what the declarant, Sierra, stated. When pressed by defendant's appellate counsel, he agreed with counsel's characterization of Sierra's statement, i.e., that she said to defendant "I'll have you locked up." Hamilton, however, admitted that he did not know what she had in mind. Hamilton testified that months later, after defendant had been charged, he then recalled Sierra's statement:

> *Q.* Okay. When you learned of the charges, did you connect the charges to what Cierra told Larry?
>
> *A.* For a minute I didn't really think of it and it kind of popped in my head like wow, it's like something going on behind that, you know what I'm saying, the statement he made to me said that she'd do that. I never heard it like verbally in

-13-

front of me but I thought about it, that she said something like this of that nature, I figured okay well, in my mind did it actually happen or did it stem from that.

On cross-examination, Hamilton admitted that he could not contextualize Sierra's statement to render some meaning to it other than that she made the statement around the end of summer, presumably in 2015, outside a building in a normal tone of voice. Hamilton testified:

> *Q*. You said something where she never said something verbally. What did you mean by that? When Mr. Monahan asked you about did you put the connection together and you said she never said verbally. I didn't understand what you meant by that answer.
>
> *A*. You mean connection together for as far as she say she see him locked up for leaving his wife, you know him what I'm saying, or whatever situation. I didn't know exactly what was going on. She made the statement so I didn't know if it something you imagine, I can get you locked up, or whatever the situation. I didn't know what was behind it.
>
> *Q*. It was just a statement, "I'll have you locked up." You don't know the reasoning behind it?
>
> *A*. Right.

Whether the MRE 803(3) hearsay exception applies to the statement made by Sierra on its surface seems a close question, but when closely analyzed, application of the exception in this case would be inappropriate. According to Hamilton, at the time, Sierra's statement had no effect on him as the listener and he had no understanding of its meaning. The statement could be interpreted simply as an expression of Sierra's present state of mind at the specific time arising, perhaps, from discord in her relationship with defendant, a married man, whose affections she hoped to have exclusively. Defendant asserts that Hamilton's testimony requires concluding that the statement indicated Sierra's present state of mind, i.e., her intent or plan to have defendant locked up if he left her. Defendant contends that the statement reveals her plan which he hoped to argue to the jury included the manipulation of the victim, Sierra's daughter, into fabricating very detailed accusations of sexual abuse, and that months later LJ fulfilled that plan by falsely accusing defendant, which led months later to the charges brought by law enforcement, defendant's trial, jury conviction, and incarceration. From Sierra's statement, defendant intended to advance a complicated conspiracy theory.

A problem arises with any interpretation of Sierra's statement, however, because one cannot decipher from Hamilton's testimony without speculation what, in fact, constituted her present state of mind. Hamilton himself lacked the ability to place the statement into any context that revealed the statement as one regarding Sierra's present state of mind, let alone a plan involving LJ. If the MRE 803(3) exception is to apply, there must be some evidence that contextualizes a declarant's statement that reveals the declarant's present state of mind, i.e., intent or plan, if that is the purpose for its admission under the exception. Application of the exception should not be left to speculation or conjecture as to context or meaning that requires an extraordinary leap of logic.

Even assuming that Hamilton's testimony regarding Sierra's statement would be admissible and revealed Sierra's present state of mind and could be used to challenge Sierra's credibility, and Cromer's failure to contact him and call him as a witness constituted performance that fell below an objective standard of reasonableness, defendant must still establish that, but for Cromer's failings, a reasonable probability exists that the outcome of his trial would have been different. The record, however, reflects that, even if the jury discounted Sierra's testimony and found that her statement made in Hamilton's presence sufficed to impeach her credibility, LJ and her grandmother, nevertheless, both served as very credible witnesses whose testimonies were consistent and unwavering. LJ, eight years old at the time of trial, testified in detail regarding the repeated sexual abuse committed by defendant against her. Even if defendant impeached Sierra's testimony with her statement in the presence of Hamilton, that would not impeach LJ's credibility or reasonably establish that LJ fabricated her accusations against defendant, nor would impeachment of Sierra's credibility impeach LJ's grandmother's testimony. The prosecution presented substantial evidence from which the jury could find defendant guilty beyond a reasonable doubt of the charged offenses. Sierra's statement, if admitted, does not cast doubt on LJ's and her grandmother's testimonies.

Defendant lacked evidence to undermine the victim's testimony. It cannot be said that, had Cromer called Hamilton as a witness and had him testify as he did at the evidentiary hearing, that a reasonable probability exists that the outcome of defendant's trial would have been different. The record reflects that the trial court properly analyzed the evidence presented at the evidentiary hearing and correctly applied the two-prong test to determine whether Cromer performed deficiently regarding Hamilton, and if so, whether but for such defective performance a reasonable probability exists that the outcome of defendant's trial would have been different. The trial court did not err in concluding that defendant failed to meet his burden regarding Cromer's investigation and failure to call Hamilton as a witness.

Turning to Cromer's failure to call Lakeisha as a witness, we also are not persuaded that defendant has met his burden. "[T]he failure to call a particular witness at trial is presumed to be a matter of trial strategy, and an appellate court does not substitute its judgment for that of counsel in matters of trial strategy." *People v Seals*, 285 Mich App 1, 21; 776 NW2d 314 (2009). But courts " 'cannot insulate the review of counsel's performance by calling it trial strategy'; counsel's strategy must be sound, and the decisions as to it objectively reasonable." *People v Ackley*, 497 Mich 381, 388-389; 870 NW2d 858 (2015), quoting *Trakhtenberg*, 493 Mich at 52. "Courts must determine whether the 'strategic choices were made after less than complete investigation,' or if a 'reasonable decision made particular investigations unnecessary.' " *Ackley*, 497 Mich at 389, quoting *Strickland*, 466 US at 690-691 (brackets omitted).

Defendant argues that Cromer's performance fell below an objective standard of reasonableness by not calling Lakeisha as a witness to enable him to argue to the jury that Sierra manipulated LJ to fabricate false accusations against defendant to have him jailed for leaving her to return to Lakeisha. Analysis of Lakeisha's testimony, however, indicates that it provided insight into the relationship between Lakeisha, Sierra, and defendant, but it would not have challenged in any manner the credibility of LJ's or her grandmother's testimonies. Lakeisha testified regarding out-of-court statements made by Sierra including during phone calls, in text messages, and in Facebook messaging, in which Sierra stated at unspecified times, perhaps during the fall of 2015, that she would rather see defendant in jail than to return to Lakeisha. The trial court interpreted

such messages as reflective of two women's competition for the affections of the same man and questioned whether such statements were even admissible since the statements appeared to be hearsay. Defendant argued to the trial court that the statements would have been admissible under the MRE 803(3) hearsay exception comparable to the way in which Hamilton's testimony would be admissible.

Close analysis of Lakeisha's testimony regarding her interactions and communications with Sierra reveals that the two women were vying for defendant's affections and tensions existed between them arising from their respective feelings for defendant. The Facebook messages between the two women that defendant presented to the trial court revealed nothing more than that. They did not feature any threat made by Sierra toward defendant. The other statements about which Lakeisha testified, that Sierra said that she would rather see defendant in jail than with Lakeisha, were made months before LJ disclosed the abuse to her grandmother. Sierra's statements to Lakeisha, although potentially useful to challenge Sierra's credibility, on their face are not exculpatory evidence favoring defendant. Defendant has not established that the statements were, in fact, exculpatory evidence that would have exonerated him.

The record reflects that the trial court properly assessed whether that testimony, if admitted and served to challenge Sierra's credibility, would have any bearing on LJ's or her grandmother's testimonies. The trial court concluded from its analysis that Lakeisha's testimony would in no way undermine LJ's or her grandmother's testimonies. The trial court did not err in this regard.

LJ testified credibly in significant detail regarding the sexual abuse she endured while alone with defendant at home while Sierra worked outside the home. Even if Hamilton's and Lakeisha's testimonies were presented and undermined Sierra's credibility, LJ's and her grandmother's testimonies would remain intact and their respective credibility unchallenged. The record indicates that the trial court properly analyzed the evidence presented at the evidentiary hearing and correctly applied the two-prong test to determine whether Cromer performed deficiently by not calling Lakeisha to testify; and if so, whether but for Cromer's failure to call her, a reasonable probability exists that the outcome of defendant's trial would have been different. The trial court did not err in concluding that defendant failed to meet his burden regarding Cromer's failure to call Lakeisha as a witness. Based upon the record, even if Lakeisha's testimony regarding Sierra's out-of-court statements is deemed admissible, one cannot conclude that, had she testified, a reasonable probability sufficient to undermine confidence in the outcome exists. Accordingly, defendant has failed to meet his burden in this regard.

Defendant also argues that he suffered cumulative prejudice from his trial counsel's deficient performance in admitting the CARE House transcript and by failing to call Hamilton and Lakeisha to testify. We disagree.

The cumulative effect of a number of errors may amount to error requiring reversal. *People v Cooper*, 236 Mich App 643, 659-660; 601 NW2d 409 (1999). Under the cumulative error doctrine, reversal and remand for a new trial is appropriate where the cumulative effect of several errors establishes that the defendant did not receive a fair trial, even though no one error by itself warranted a new trial. *People v Bahoda*, 448 Mich 261, 292 n 64; 531 NW2d 659 (1995). The test on appeal is whether the defendant received a fair trial, despite any irregularities, or whether the irregularities so undermined the fairness of the trial that a new trial is warranted. *People v*

*Skowronski*, 61 Mich App 71, 77; 232 NW 2d 306 (1975).  To determine whether the cumulative effect of errors warrants a new trial, this Court only aggregates actual errors.  *People v LeBlanc*, 465 Mich 575, 591 n 12; 640 NW2d 246 (2002).

This Court previously concluded that, given that the content of the CARE House transcript was highly inculpatory, Cromer's claimed strategy improperly chose to admit it into evidence. This Court, however, did not definitively decide whether counsel's performance was objectively unreasonable because this Court agreed with the trial court that defendant failed to establish outcome-determinative prejudice.  As explained in this opinion, the trial court did not err by ruling that Cromer's failure to call Hamilton and Lakeisha as witnesses at trial did not constitute defective performance and even if considered deficient because he failed to call them, defendant could not establish that but for Cromer's defective performance a reasonable probability exists that the outcome of his trial would have been different.  Although Cromer performed deficiently by admitting the CARE House transcript, we do not consider Cromer's failure to call Hamilton and Lakeisha defective performance because those witnesses could not actually provide exculpatory evidence.  As explained herein, at most their testimonies may have challenged Sierra's credibility but could do nothing to undermine LJ's or her grandmother's credibility or cast doubt upon LJ's testimony regarding defendant's commission of child sexual abuse against her on several occasions.  Moreover, no evidence established that LJ fabricated her allegations of defendant's sexual abuse.

Therefore, even if we accepted defendant's contention that Cromer performed deficiently by not calling Hamilton and Lakeisha as witnesses, and aggregate that with his objectively unreasonable decision to admit the CARE House transcript, we remain unconvinced that such defective performance suffices to undermine confidence in the outcome of defendant's trial.  We remain convinced that Cromer had few options in terms of strategy given the strength of the prosecution's proofs, such that, even if he erred in the ways that defendant claims, defendant cannot establish that a reasonable probability exists that the outcome of his trial would have been different.  Accordingly, we hold that the trial court did not err by ruling that defendant failed to sustain his claim that his trial counsel performed deficiently in multiple ways, the cumulative effect of which prejudiced him and resulted in an unfair trial requiring a new trial.  The trial court properly analyzed each aspect of defendant's claims of defective performance and correctly determined that a reasonable probability of a different outcome did not exist.  The trial court, therefore, properly denied defendant's motion for a new trial.

Affirmed.

/s/ Michael F. Gadola
/s/ James Robert Redford